No. 49,234

STATE OF KANSAS, *Appellee,* v. BRIAN J. NIXON, *Appellant.*

(576 P.2d 691)

Opinion filed April 1, 1978.

*Charles E. Worden,* of Topeka, argued the cause, and *Douglas A. Hinchcliff,* of Topeka, was with him on the briefs for appellant.

*J. Larry Linn,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Stuart W. Gribble,* assistant district attorney, were on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This is a direct appeal by defendant, Brian J. Nixon, from convictions in a trial to the court of one count of rape (K.S.A. 21-3502) and one count of aggravated sodomy (K.S.A. 21-3506[a]). Defendant was found not guilty of aggravated kidnapping (K.S.A. 21-3421).

In view of the limited issues considered on appeal we do not deem it necessary to go to great lengths in setting forth the facts and will limit them to those pertinent to the issues considered.

Defendant, a resident of Great Bend, and Karen Dikeman, a resident of Wichita, became acquainted at a Wichita tavern in the early fall of 1975. On the night of October 10, 1975, defendant telephoned Miss Dikeman from Great Bend, asked if he could come to Wichita, stay at Miss Dikeman's grandfather's house where she lived and take her out on a date the next night. Miss Dikeman said it would be all right. Defendant arrived at her grandfather's around 3:00 a.m. October 11, 1975. He and Miss Dikeman had a soft drink, left the house to smoke some marijuana, then returned and spent the rest of the night in separate bedrooms. They were together most of Saturday and in the evening departed from the house to go on a date. They rode around, stopped at a couple of taverns to buy six-packs of beer, smoked some more marijuana and eventually drove to a secluded spot in a pasture in eastern Sedgwick County where defendant parked the car.

At this point a sharp divergence in the testimony develops. Miss Dikeman contends she was taken into the country against her will, that she feared for her life, that she tried to escape several times, that defendant, over a period of two to three hours, forcibly raped her three or four times and forced her to commit an act of sodomy. She further contends that while both parties were still completely in the nude she tricked the defendant into leaving the immediate area on foot to search for her lost cigarettes and

thus was able to get into defendant's car, lock the doors and make her escape. Defendant, observing what was taking place, leaped aboard the hood of his automobile and was thus transported, still sans clothing, out of the field, down the country road and into the front yard of the nearest farm house. Miss Dikeman then placed the car in reverse and defendant slid off the hood into the farmyard. As she was departing the scene, Miss Dikeman advised defendant his car would be at her house.

Defendant readily admits that the sexual acts took place but contends Miss Dikeman was a more than willing participant, that no force or threats were involved, that after two or three hours of mutually enjoyable lovemaking she suddenly "went crazy," took his car and drove off. As a result of defendant's admission that the sexual acts took place the sole issue before the court was one of consent. The testimony of police officers, a medical examiner, Miss Dikeman's regular doctor and others could be construed as supporting either participant's story. Testimony of one witness, admitted under K.S.A. 60-455 to show plan and intent, was definitely supportive of Miss Dikeman's version of the facts.

The trial judge recognized the principal issue when making a statement to counsel in chambers before announcing his decision in open court:

". . . Now, the whole question is whether or not there was consent involved or whether it was force.

". . . I tried to evaluate the testimony of each of the two principal parties against other evidence to see which one I thought was telling the truth, and I concluded that the victim was telling the truth. . . ."

It is readily apparent that the question of which party was telling the truth was a major, if not the determining, factor in the court's decision.

Several times during direct examination of Miss Dikeman the prosecutor brought out the use of marijuana by both parties. On cross-examination Miss Dikeman volunteered information about the use of "downers" and other drugs and was then questioned about such use. Later in cross-examination the following took place:

"Q. Okay. Now, Miss Dikeman, you testified earlier in your cross-examination that you had at times utilized drugs, primarily marijuana, what you referred to as downers; is that correct?

"A. Yes.

"Q. Did you ever engage in the sale of items like this?

"A. No.

"Q. You never engaged or offered for sale any narcotic drugs of any type?

"A. No, I never did.

"Q. Are you acquainted with a person by the name of Kenny Sick?

MR. ROBINSON: Objection, Your Honor, no showing of relevance of who Kenny Sick is.

MR. EARNEST: It will be tied in later, Your Honor.

THE COURT: Go ahead.

"Q. [By Mr. Earnest] Are you acquainted with Kenny Sick?

"A. No.

"Q. You don't know him?

"A. I have never heard of him."

During the presentation of the defendant's case, Kenneth K. Sick was called as a witness. Sick testified that he was acquainted with Karen Dikeman, that he had seen her on at least three occasions around September, 1975, and on one of those occasions had a date with her and took her, along with another friend, to an all-night movie. Then the following dialogue took place:

"Q. . . . Okay. Did you have occasion to see Karen Dikeman again?

"A. Yes, I saw her—well, I saw her in September when she—in an apartment of a friend's house. She came there. I was present, and she showed up and came in.

"Q. What—

"A. As she was—at that time she was—

MR. SKINNER: Your Honor, I'm going to object right now as not being responsive to the question. He asked if he saw her again.

THE COURT: Okay.

MR. NEUSCHWANDER: All right. He has answered that.

. . . . . . . . . . . . . . . . . .

"Q. [By Mr. Neuschwander] Where did you see her on your second meeting?

"A. I saw her in the apartment near my home at a friend's house.

"Q. Okay. Did you see Karen Dikeman do anything on this occasion?

"A. Uh-huh. She—

MR. SKINNER: Your Honor, I am going to object at this point in time. I would like to be heard. I have a case from the Kansas Supreme Court that I would like the Court to read.

THE COURT: The Court is familiar with the law. In order to attack character you have got to show they did something dishonest or something like that, either conviction of a felony, dishonest felony or something dishonest. This isn't that. It may be disreputable and abominable. It's not dishonest.

MR. NEUSCHWANDER: The sale of drugs is not dishonest?

THE COURT: Not dishonest.

MR. NEUSCHWANDER: Well, Your Honor, I believe—

THE COURT: It's regrettable and people shouldn't do it, and it's against the law, but it's not one of those exceptions that's in the statute on attacking character and credibility.

MR. NEUSCHWANDER: Well, Miss Dikeman did testify when she was cross-examined she had never engaged in the sale of narcotics."

Defendant raises several points on appeal, two of which will be considered at some length.

Defendant contends the court committed reversible error in preventing him from introducing evidence on the only issue before the court and his theory of the case. He argues that consent was the only issue to be determined by the court and therefore the truthfulness of the alleged victim in giving her testimony *in this case* was of major importance. He contends he should have been allowed to examine Sick on issues, collateral in nature, which would show that Miss Dikeman had not been truthful in her testimony.

K.S.A. 60-420 provides:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

K.S.A. 60-422 provides in part:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

K.S.A. 60-421 deals specifically with the admission in evidence of prior convictions and as such is not directly involved in this case.

In *State v. Belote,* 213 Kan. 291, 516 P.2d 159 (1973), we held:

Syl. ¶2. "Drug offenses *per se* do not involve dishonesty or false statement in their commission; hence K.S.A. 60-421 renders convictions for such offenses inadmissible for the purposes of impairing the credibility of a witness."

Syl. ¶3. "Evidence of traits of a witness' character other than honesty or veracity or their opposites, as well as evidence of specific instances of the witness' conduct relevant only to prove such traits of character, are inadmissible as affecting credibility."

Syl. ¶4. "For the purpose of discrediting a witness, evidence is not admissible to show that he is a user of drugs, or to show the effect of the use of such drugs, unless it is shown that the witness was under their influence at the time of the occurrences as to which he testifies, or at the time of the trial, or that his mind or memory or powers of observation were affected by the habit."

In *Belote,* supra, at page 295, in commenting on K.S.A. 60-422(c) and (d), we stated:

"The latter statute makes distinction between traits of character and specific instances of conduct, a distinction not always easy to apply with respect to the use of drugs. Nonetheless the import is clear—evidence of traits of a witness' character other than honesty or veracity or their opposites, as well as evidence of specific instances of the witness' conduct relevant only to prove such traits of character, are inadmissible as affecting credibility.

"The questions put to the witness here to which objections were sustained clearly were probing either for testimony that she was an addict (which she denied in an answer elicited over the state's objection) or that she had taken drugs. Treating drug addiction as a trait of character as we think it must be, it is not one either of honesty or veracity or their opposites and hence evidence of the same is inadmissible. Likewise, evidence of specific instances of improper drug use relevant only to prove such trait is also inadmissible. A majority of the courts in other jurisdictions which have wrestled with the same problem have, in the absence of statute, come to the same conclusion. . . ."

Defendant argues he is not attempting to show traits of Karen Dikeman's general character or specific instances of conduct to prove a trait of character, but sought to introduce the testimony of Sick to show she was not being truthful in this case rather than to challenge her usual reputation for veracity.

*Dewey v. Funk,* 211 Kan. 54, 505 P.2d 722 (1973) was a paternity action brought in the name of the child by her mother against the alleged father to obtain support. The principal question was the ruling of the trial court in refusing to admit testimony as to prior sexual activity of the mother after she had testified she was a virgin at the time of the incident resulting in the conception of the child. At page 56 the court said:

"If one party offers an irrelevant and therefore inadmissible fact which is received in evidence, may the other party offer similar facts whose only claim to admission is that they negate or explain or counterbalance the prior inadmissible fact? Wigmore on Evidence, 3d Edition, § 15, pp. 304, 305, 307, suggests there are three rules competing for recognition:

'(1) The first is that *the admission of an inadmissible fact, without objection by the opponent, does not justify the opponent in rebutting by other inadmissible facts;*

. . . . . . . . . . . . . . . . . . . .

'(2) At the other extreme is a rule which declares that, in general, precisely the contrary shall obtain, *i.e., the opponent may resort to similar inadmissible evidence;*

. . . . . . . . . . . . . . . . . . . .

'(3) A third form of rule, intermediate between the other two, is that the opponent may reply with similar evidence *whenever it is needed for removing an unfair prejudice which might otherwise have ensued from the original evidence,* but in no other case. . . .'

We prefer the adoption of Rule 3. It provides the flexibility necessary to assure the

issues will not be tried on uncontradicted, prejudicial testimony of an unimpeached witness, but avoids trial of nonprejudicial collateral matters."

In *Belote* objections were lodged at the outset against questions seeking to inquire into collateral issues and we held the trial court was correct in sustaining such objections. On the other hand, in *Dewey,* the collateral or irrelevant testimony was allowed without objection and we held it was error not to allow the defendant to show that such testimony was false. While it is true in the case at bar that it was the defendant who first elicited the objectionable testimony from the complaining witness, once it had been allowed, without objection, defendant should have been able to show that it was false.

*State v. Blue,* 221 Kan. 185, 558 P.2d 136 (1976) was an appeal from a conviction for forgery wherein defendant Blue (a/k/a Jackson) had presented a forged drug prescription to a pharmacy in Wichita. This occurred during the afternoon of July 7, 1975. During the presentation of the defendant's case, both he and a companion, Goodbear, testified that they had been at home all morning on July 7, 1975. The state offered evidence in rebuttal that the two of them had, in fact, visited another pharmacy during the morning hours and had obtained a quantity of drugs with a valid prescription. The trial court ruled the evidence, though collateral in nature and ordinarily not admissible, was admissible as rebuttal evidence going to credibility. We stated at page 188:

"The rebuttal evidence was competent to show that the testimony of Goodbear and Jackson that they did not visit any other pharmacy that day was false; it was thus admissible to attack their credibility under K.S.A. 60-420."

"It is a familiar rule of this court that the scope and extent of cross-examination of a witness on collateral matters for the purpose of impeaching his credibility rests largely in the trial court's discretion. There must be some showing of abuse or of prejudice to the appealing party before a reversal is justified." *State v. Nix,* 215 Kan. 880, 884, 529 P.2d 147 (1974). See also, *State v. Ralls,* 213 Kan. 249, 515 P.2d 1205 (1973) and *State v. Burnett,* 221 Kan. 40, 558 P.2d 1087 (1976).

We fully adhere to the rule of *Nix;* however, under the peculiar facts and circumstances in this case, we find that it was error to preclude the defendant from presenting evidence in an attempt to prove that the prosecuting witness had been untruthful in her testimony.

Defendant's second principal point is that he was deprived of his right to a fair trial when certain matters took place in chambers without his knowledge. At the close of all the evidence

and arguments the judge announced that he would take the case under advisement, review his notes and the exhibits, study the cases submitted by the parties and announce his decision the next morning at 10:00 a.m.

The next morning counsel met with the court in chambers and the judge advised counsel on the record of his view of the evidence and then the following transpired:

"THE COURT: Let the record reflect that I have all counsel in Chambers. Last night before I left, all of you had given me some cases to read, and I read all of these cases and went over the facts last night, and I pretty well got the facts figured out in my mind how I think they should be last night. Does anybody want to have any other law or cases you want to give me before I go into the ruling this morning?

"MR. SKINNER: We don't have any.

"MR. EARNEST: I don't believe we do, Your Honor.

"THE COURT: . . .

"Now, I made my mind up last night on this case on the facts and went over it, examined it, tried to figure out in my head what happened, and actually it develops down into a question of who are you going to believe. This isn't the ruling. I am going to give the ruling in open Court, but there are some things I want to say before I go into open Court.

. . . . . . . . . . . . . . . .

"I was real disgusted with both of them [for] smoking pot, drinking, that type of thing. I question whether either one of them was fully in charge of their faculties that night. It's unfortunate that young people have to get in a mess like this. So, to make a long story short, I have concluded that there was no kidnapping, that the elements don't indicate that to me; that there was forcible rape and that there was sodomy. But since the sodomy and the rape all occurred in the same sort of situation, there will be concurrent sentences, same time.

"Now, one other thing. Like I told you, I made my mind up last night before I went home. This morning coming up on the elevator, I heard someone say that the defendant failed to pass a lie detector test. I don't know whether that's true or whether it's not true. It played no part in my decision, but I wanted counsel to know before I rule. If defense counsel thinks that has prejudiced this Court, I'll declare a mistrial. Do you want a little time to think about it?

"MR. EARNEST: No, Your Honor. I'm quite sure it played no part in your decision.

"THE COURT: Pardon?

"MR. EARNEST: I'm quite sure it played no part in your decision, and I would see no reason for the Court not to go right ahead."

Court was then convened and the trial court in the presence of the defendant again reviewed the evidence as he saw it and rendered his decision.

It was several months after this appeal had been perfected before defendant learned of the discussion which took place in

chambers and due to the serious nature of the question raised we allowed defendant to obtain new counsel and file a supplemental statement of points on appeal, record and brief. The state has declined the opportunity to answer the supplemental brief and we do not have the benefit of the state's position on this issue.

While we are convinced that the inadmissible evidence, consisting of the statements overheard in the elevator, played no part in Judge Riddel's decision, we are of the opinion defendant should have been advised and given the opportunity to consult with his counsel. The trial judge, when he made a record of the informal proceedings, offered to declare a mistrial and to give defense counsel time to think about it, obviously considered the matter to be a serious one affecting defendant's fundamental rights. We agree.

The functions of defense counsel in a criminal case have been reviewed several times by this court.

"In the conduct of the defense of a criminal case the technical and professional decisions, which require trained professional skill and judgment, must rest with the lawyer. The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer *after consultation with his client.*" (Emphasis added) *Winter v. State,* 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972). See also, *State v. Ames,* 222 Kan. 88, 563 P.2d 1034 (1977), and ABA Standards for Criminal Justice, Defense Function, § 5.2.

We do not mean to imply that counsel's decision in this case indicates a lack of competence. It could very well be that as a matter of trial strategy, counsel determined it would be in his client's best interests not to accept a mistrial. Counsel had been informed that the court did not feel the evidence warranted a conviction of aggravated kidnapping, a Class A felony. If defendant accepted a mistrial he would have been faced with a retrial on all the issues and a possible later conviction of the more serious offense. However, under the facts and circumstances of this case, before waiving defendant's right to a mistrial volunteered by the trial court, defendant should have been consulted by counsel and given an opportunity to consider the alternatives.

Considering all foregoing factors, we find prejudicial error and hold that the case must be reversed and remanded for a new trial. Defendant raises several other points on appeal but in view of the conclusions reached, it is not necessary to consider them further.

The judgment is reversed and the case remanded for a new trial.

PRAGER, J., concurring in the result.

MCFARLAND, J., dissenting.