No. 105,483

STATE OF KANSAS, *Appellee*, v. DEAN J. BOLEYN, Jr., *Appellant*.

(303 P.3d 680)

Opinion filed June 14, 2013.

*Ryan Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Keith E. Schroeder*, district attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Dean J. Boleyn, Jr., was convicted of aggravated indecent liberties with a child and sentenced to a hard 25 life sentence pursuant to Jessica's Law. On appeal, he argues that the district court erred when it admitted evidence at his jury trial establishing that he possessed pornography depicting homosexual acts. Boleyn also argues that the district court erred when it determined that his life sentence was constitutional.

## FACTS

Boleyn began a romantic relationship with Angela Valentine around Christmas 2005. Valentine had two sons from a previous relationship, T.V. (born May 3, 1999) and A.V., who was younger than T.V. She shared custody of the two boys with their father, Nick Valentine.

In May 2006, Boleyn and Valentine moved into an apartment in Wichita. Then, sometime between late January and early February 2007, they moved into a house outside of Haven near Cheney Reservoir. T.V. and A.V. would stay at the house on days and weekends that Valentine had custody of the boys.

Boleyn developed a seemingly appropriate relationship with the boys. While he was living in the house, Valentine never observed anything to raise any concerns about Boleyn's relationship with either boy. But Valentine believed Boleyn spent a lot of time with T.V., leading to arguments between the couple. Valentine said that

Boleyn "was just more interested in spending time with [T.V.] than he was with spending time with me" and felt that Boleyn had a better relationship with T.V. than with her. With regard to A.V., Valentine said that although Boleyn interacted with A.V. and "wasn't bad" to him, she believed that Boleyn favored T.V. and that Boleyn's relationship with A.V. was not nearly as close as his relationship with T.V. Valentine said that Boleyn and T.V. "were inseparable."

Boleyn and Valentine's relationship deteriorated because, according to Valentine, the sexual aspect of their relationship was "nonexistent." This led Valentine to ask Boleyn sometime in January 2009 whether he was gay. According to Valentine, Boleyn answered by saying, "[N]o, I don't think so." Three to four days after Valentine questioned Boleyn about his sexuality, he moved out of the couple's home and into his parents' home in Wichita.

Because of the boys' close relationship with Boleyn, Valentine decided that it was in their best interest for them to continue seeing Boleyn. Accordingly, Valentine made arrangements for Boleyn to spend time with the boys. Valentine said that usually on Sundays Boleyn would come to the house and pick up both boys and take them out for a few hours.

Several months after Boleyn moved out, Valentine began to feel discomfort regarding Boleyn's relationship with T.V. According to Valentine, Boleyn called T.V.'s cell phone a lot and sent text messages to him late at night. Valentine read some of these text messages. She recalled one text message which caused her some concern: Boleyn texted T.V. that he was going to take a nap and asked T.V. to take a nap with him.

Sometime in the summer 2009, Valentine asked Boleyn to fill out some paper-work so she could file a claim with his mortgage insurance (Valentine was having trouble paying the mortgage, and Boleyn had been unemployed for 2 months.). Boleyn did so, and Valentine filed a claim with the insurance company. Eventually, the insurance company mailed a check to Valentine for $2,696.83, but the check was made out to Boleyn. In July 2009, Valentine contacted Boleyn and asked him to meet her at her bank—located inside Walmart—so he could sign the check over to her, enabling

her to receive the proceeds. Boleyn agreed to do so, but on his way to Walmart, he called Valentine and told her that he wanted $1,000 from the check. Valentine told him she would not give him any money from the check.

When Boleyn arrived at the bank in Walmart, he and Valentine got into an argument. Valentine told Boleyn that unless he endorsed the check, he was not going to see the boys anymore. Boleyn got up to leave, apparently taking the check with him. Valentine and Boleyn started struggling with each other over the check. Valentine finally told Boleyn that she would give him $500 and allow him to see the boys if he signed the check. Boleyn agreed and eventually signed the check over to Valentine. Instead of giving Boleyn $500, however, Valentine ultimately deposited the entire amount in her account. According to Valentine, Boleyn walked away from the bank very angry.

On July 26, 2009, shortly after the incident at Walmart, Valentine—based on a feeling she was having that something was wrong with T.V.—asked T.V. if anyone had ever done or said anything to him that made him feel uncomfortable. T.V. answered yes. Valentine then asked T.V. who had made him feel uncomfortable. T.V. was not immediately forthcoming with an answer but eventually said, "Dean." At that point, Valentine did not question T.V. anymore but called Nick, T.V.'s father, to come over to the house to speak with T.V.

Nick arrived at the house about 20 to 25 minutes later, and he and T.V. spoke by themselves outside. After the conversation, Nick told Valentine what T.V. had told him (Nick did not testify at trial, so the contents of this conversation were not admitted at trial.). After speaking about the conversation, Valentine and Nick agreed to contact the police.

Because Valentine believed that the Haven Police Department lacked the capabilities to investigate the alleged crime, she decided to contact the Wichita Police Department. They went to Nick's parents' house in Wichita, and a Wichita police officer came to the home and took a report. Valentine was eventually told to make a criminal report in Reno County. On July 27, 2009, she made a report to the Reno County Sheriff's Department.

On August 12, 2009, a police detective came to Valentine's home to record a phone conversation between T.V. and Boleyn. T.V. placed a phone call to Boleyn using the home phone while the detective recorded the conversation and wrote statements for T.V. to say to Boleyn over the phone.

The phone conversation lasted a little over 23 minutes. After initial pleasantries and telling Boleyn about accidentally shooting his younger brother with a BB gun, T.V. told Boleyn that he thought Valentine knew "what happened" between them. Boleyn said, "I don't think so," and asked T.V. if he had said anything. T.V. said no. Boleyn said that Valentine was probably mad at him for what happened at Walmart. T.V. told Boleyn that Valentine had been asking questions about "what's been going on between you and me." Boleyn said, "She has?" Boleyn then asked T.V. if he knew what would happen if he said anything. Boleyn said he would "be going to jail for the rest of his life." T.V. asked why, and Boleyn said because "it was not right" because he was an adult and T.V. was a kid.

T.V. then asked Boleyn why he did "those things" to him. Boleyn said he did not know and that "it just kind of happened." Boleyn promised T.V. that it would never happen again and told T.V. that he was sorry. Boleyn said that what he did was wrong and that he should have never done it. T.V. then asked Boleyn, "[W]hy me?" Boleyn said, "I don't know, it just kind of happened."

Boleyn asked T.V. if it was going to be okay, and T.V. said yes. Boleyn promised it would never happen again and told T.V. that he loved him. He also told T.V. that he would always be there for him. T.V. said that he was having bad dreams about "it." Boleyn said that he was having some pretty bad dreams too and that he had been having trouble sleeping for the last 3 weeks. Boleyn said that he prayed to God every night to forgive him for what he had done.

T.V. asked Boleyn whether, if they got together in the future, he would touch him again like he had done before. Boleyn said, "[N]o, never again." Boleyn said that he was really sorry for what had happened and promised it would never happen again.

T.V. then told Boleyn that Valentine had been asking him questions and asked Boleyn what he should tell her. Boleyn told T.V. that it was up to him to decide what to tell Valentine, but reminded T.V. that he knew the "consequences" if he told Valentine. Boleyn told T.V. that if he wanted that to happen, so be it. Boleyn said that he would be gone forever and that his life would be over. Boleyn then told T.V. that he would like it if T.V. did not say anything. Boleyn promised not to do "it" again and acknowledged what he did was wrong and said that he apologized for it. Boleyn then said he would really like it if he did not have to go to jail for the rest of his life. He said that "they would probably kill" him for "one mistake." He then told T.V. that he would always be there for him.

T.V. then told Boleyn that what he did made him feel weird. Boleyn said that he felt weird too. T.V. said that he had "never been touched like that." There was a long silence before T.V. finally said, "Hello?" Boleyn responded by telling T.V. that if he needed something, he could just call him. Boleyn then asked T.V. if he was mad at him. T.V. said no.

After talking about various things, T.V. eventually told Boleyn that Valentine was considering taking him to a counselor. T.V. suggested that he was going to tell the counselor what happened. In response, Boleyn told T.V. that he knew what would happen if he did that. Boleyn asked T.V. if he was "really that upset" and then asked T.V. why he did not say something to him about being upset. T.V. responded by saying that he never had a chance. Boleyn told T.V. that he always had a chance to tell him. Boleyn then said that he was really sorry for what had happened and that he hated himself "more for doing it." He also said that he would have to live "with that" for the rest of his life. He said that if he could "take it all back," he would do so in a heartbeat.

Boleyn told T.V. the worst part about "it" was that he hurt T.V.'s feelings and he never meant to do that. T.V. asked Boleyn why he did it. Boleyn answered by saying he didn't know and that "it just kind of happened." He said he did not understand "why it happened, it just happened." Boleyn said that he hoped T.V. would forgive him. Boleyn told T.V. that he cared about him too much

to ever do it again. T.V. asked Boleyn if he did it because he thought it would make T.V. feel good. Boleyn said, "I don't know, I don't know what I was thinking." Boleyn said that it had never happened before and that it would not happen again. T.V. eventually told Boleyn that his mom was coming home and quickly ended the phone call.

The next day, August 13, 2009, police arrested Boleyn. He was charged with five counts of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(3)(A). The State alleged that these crimes occurred between July 27, 2007, and February 2009, when T.V. was between the ages of 8 and 10 years old.

Boleyn's case proceeded to trial. During opening statements, defense counsel stated that the evidence presented at trial would show that Boleyn did not sexually abuse T.V. and that Boleyn was not gay. Notably, during the State's opening statement, the prosecutor did not mention anything about Boleyn's sexual preference.

The State's evidence at trial consisted of the testimonies of Valentine and T.V., and the recording of the phone conversation between T.V. and Boleyn. T.V., who was 11 years old and in fifth grade at the time of trial, said that he had had a good relationship with Boleyn. He said that the two of them would play video games and watch television. T.V. said that Boleyn gave him a lot of attention.

Despite testifying about having a good relationship with Boleyn, T.V. said that Boleyn had touched his privates (*i.e.*, his penis) in a "bad way." T.V. said that Boleyn would use his finger to "poke" T.V.'s penis and that Boleyn would also touch T.V.'s penis with his mouth. T.V. also said that Boleyn made him put his mouth on Boleyn's penis. T.V. said that he would tell Boleyn to stop but that Boleyn would say no and keep going.

T.V. said that the touching occurred while Boleyn was living with Valentine in the apartment in Wichita and while Boleyn was living in the house near Haven. T.V. said that when Boleyn was living in the apartment in Wichita, Boleyn would touch him once a week. T.V. said that the frequency of the touching increased to two to three times a week once Boleyn moved into the house. When asked to state how many times Boleyn had touched him, T.V. said that

he did not know, but that it happened "[a] bunch." T.V. said that the touching ended once Boleyn moved out of the house.

T.V. said that the reason he did not tell anyone sooner about Boleyn touching him was because Boleyn told him that they would both get into trouble.

Finally, T.V. said that the "it" he and Boleyn discussed during their phone conversation referred to Boleyn touching him "in the private parts."

Boleyn testified at trial, stating that between May and June 2009, after he had moved out of the house, his relationship with Valentine deteriorated. Boleyn said that Nick informed him that Valentine was spreading rumors that he was gay, which made Boleyn angry. Defense counsel asked Boleyn if he was gay, and Boleyn said no.

With regard to the recorded phone conversation between Boleyn and T.V., Boleyn explained that a couple of months prior to the August 12 phone call he was having visitation with the boys at his parents' house in Wichita. Boleyn and the boys were playing video games when the boys decided they wanted to wrestle. While wrestling, Boleyn said that T.V. kneed him in the groin area. Boleyn said that he reacted by hitting T.V. in the groin, causing the boy to fall on the ground and begin crying. Boleyn tried consoling T.V., but·T.V. told him he hated him and that he was going to tell his mom. Boleyn was eventually able to console T.V. and asked T.V. not to tell Valentine. Accordingly, Boleyn said that this incident was what he and T.V. were discussing during the August 12 phone call. Boleyn explained that during the conversation, he told T.V. he would go to jail for the rest of his life because he did not know the consequences of hitting a child of T.V.'s age in the groin. Boleyn specifically denied ever sexually molesting T.V.

Prior to the prosecutor's cross-examination of Boleyn, the prosecutor asked the court if the parties could address a matter outside of the presence of the jury. Once the jury exited the courtroom, the prosecutor stated:

"Judge, I tried very hard in this case to avoid any reference to the fact a search warrant was executed on the defendant's residence where he was living in Wichita on August 14, 2009. In his bedroom or adjoining bedroom in his property we found large amounts of child pornography involving young males. I did not bring

that in, but when the defendant stands on the stand under oath and tells the jury he's not gay and he's in possession of pornography showing with young boys, Judge, I think that opens the door for rebuttal. Before I go there, I want to address the issue with the Court. He specifically testified under oath he wasn't gay, and we have child pornography involving young boys. So I think he's opened it up for questioning on that issue.

"[Defense Counsel]: Judge, Counsel can't open his own door. He brought that up in his case in chief when he asked Angela Valentine the circumstances under which they separated. He cannot open his own door, and certainly since he opened the door, Mr. Boleyn is entitle [sic] to respond to it. If there's something that [the prosecutor] wants to submit in rebuttal, I haven't seen it, Judge. If this is something that was taken as a result of a search warrant, I haven't seen it, and I would object on those grounds, and [the prosecutor] cannot open his own door. Mr. Boleyn was simply responding to an allegation that [the prosecutor] brought up on in his case in chief by Angela Valentine.

. . . .

"[The Prosecutor]: Judge, the first time anything was mentioned about gay was in opening statements with [defense counsel] mentioned something about; that was something she could say. She discussed that with the jury, Judge. I figured that's where we were going with the case, but I never asked whether he was gay. I never brought that issue. I never tried. I never tried to use that as springboard to get it into my case in chief. But when the defendant says under oath he's not gay, we have evidence that would be to the contrary, Judge, I think it's admissible. With regard to her not having the child pornography in her possession, that's correct. I can't copy it for her. There was a report. I discussed it with her earlier and I think I sent her reports or faxed the reports about the discovery of that on the computer and I told her I'm not going to bring it in. In fact we were going to meet on Friday and go over it. And I said, no, I'm not going to bring that in because when I reviewed the case law, making a link between fondling a boy and possessing child pornography of young boys is something by the Supreme Court we cannot put in the same case because they are different types of conduct and they are not permissible. I decided not to bring it in. I told her I would not bring it in. We're talking about rebuttal now. We're not talking about case in chief.

"[Defense Counsel]: Judge, I did not voir dire on the issue of gay, or Mr. Boleyn being gay, or how the jury felt about people who are gay. Did not open that on voir dire. I did not address it in opening statements, and [the prosecutor] opened his own door when he asked Angela Valentine the circumstances under which they separated and he knew that would [elicit] that answer. Mr. Boleyn is entitled to respond to that without [the prosecutor] saying that he's opened the door to something that's not admissible in the courtroom.

"The Court: You're saying that [defense counsel] opened it up in opening statements and in voir dire?

"[The Prosecutor]: Judge, I'm saying that the first mention of this issue about the gay thing came up, my recollection, was opening statements by [defense coun-

sel]. I had never mentioned that issue. In fact I wasn't really sure how to approach it until that point. But I guess the bottom line is this, there were allegations she confronted him and said, 'I think you're gay.' He got mad. That's not a problem. I don't think we opened the door yet. It's not until he then later says he got really mad because she was going around telling people he was gay and he got really upset about this and then this; the question was asked, are you gay? And he said, no, under oath. I mean that's completely different than what was presented on the State's case. . . .

"[Defense Counsel]: Judge, [the prosecutor] is splitting hairs. Is splitting hairs in order to get evidence admitted into this courtroom that is not admissible. We did not open the door, Judge.

"The Court: Well, you're—you want to put it on rebuttal?

"[The Prosecutor]: I want to ask questions of the defendant on the stand about whether he possessed images of young boys that were naked when he said he wasn't gay.

"[Defense Counsel]: Then I need to see the evidence, Judge. I asked [the prosecutor] to see this evidence. And he said, it's not necessary. I'm not [e]ven going to touch it. I need to see the evidence before we go into this for once and for all. I need to see the evidence."

The Court agreed to recess for the evening in order to allow defense counsel to view the evidence at issue.

The next morning, outside the presence of the jury, the district court held another hearing with the parties to discuss the evidence at issue. The prosecutor informed the court that the parties had agreed on an initial resolution of the issue. The parties would enter into a stipulation stating that the police found pornography in Boleyn's room depicting homosexual and heterosexual conduct. They agreed to do this instead of mentioning that Boleyn possessed child pornography.

The parties' stipulation stated the following:

"1. On August 14, 2009, Dean J. Boleyn, Jr., was residing at his parents' home [in] Wichita, Kansas;

"2. On August 14, 2009, a search warrant was served by the Reno County Sheriff's Department and Wichita Police Department on the residence [in] Wichita, Kansas;

"3. Dean Boleyn, Jr. cooperated with law enforcement in the execution of the search warrant and provided them entry into the residence;

"4. Dean Boleyn, Jr. was living in a basement bedroom and had personal possessions in the residence;

"5. During the execution of the search warrant, law enforcement officers found five Memorex CD-R's that were unmarked in Dean Boleyn, Jr.'s personal prop-

erty. Two of the CD-R's were found in a non-pornographic movie case entitled 'Lord of the Flies.' Two of the CD-R's were found in a black CD case that contained music CD's. The other CD-R was found in a folder on top of Dean Boleyn, Jr.'s high school diploma;

"6. The CD-R's were seized by law enforcement and examined by a forensic computer specialist with the Reno County Sheriff's Office;

"7. One of the CD-R's contained two electronic folders with several files of personal information relating to Dean Boleyn, Jr., such as pictures and videos of construction sites, family members including [T.V.] and [A.V.] and a car. This CD-R also contained files of a pornographic nature depicting photographs of a homosexual nature;

"8. In addition to the two electronic folders that contained personal information, the five CD-R's contained forty-three separate electronic files. Thirty-six of the electronic files contained photographs and videos showing pornographic homosexual images. Four of the electronic files contained three photographs and one video showing pornographic heterosexual images. Three of the electronic files depicted non-pornographic and non-sexual images."

Though she entered into a stipulation with the State concerning the manner in which the evidence would be presented to the jury, defense counsel maintained her objection to the evidence being admitted at trial, arguing that the evidence was inadmissible as impeachment evidence. The district court admitted the evidence for impeachment purposes but noted defense counsel's objection to the evidence contained in the stipulation and granted her a continuing objection.

When trial resumed, the stipulation was admitted into evidence. The prosecutor proceeded to read the stipulation to the jury. After reading the stipulation, the prosecutor conducted his cross-examination of Boleyn, focusing on Boleyn's explanation for the content of the recorded phone conversation.

The jury ultimately found Boleyn guilty of one count of aggravated indecent liberties with a child but acquitted him of the other four counts. The district court, pursuant to K.S.A. 21-4643(a)(1)(C), sentenced Boleyn to a hard 25 life sentence. Boleyn filed a timely notice of appeal.

## The Admissibility of the Impeachment Evidence

Boleyn argues that the district court erred when it allowed the State, through the parties' stipulation, to present evidence to the

jury stating that he possessed homosexual pornography. He argues that such evidence constituted improper impeachment evidence because the State introduced the evidence for the purpose of suggesting to the jury that because Bolyen is gay (as evidenced by his possession of homosexual pornography), he has a propensity to molest young boys and, therefore, likely molested T.V. Accordingly, Boleyn argues that the evidence was unduly prejudicial and violated his right to a fair trial.

When reviewing a district court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant. All relevant evidence is admissible unless statutorily prohibited. *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). Accordingly, there are two elements of relevancy: a materiality element and a probative element. *State v. Houston*, 289 Kan. 252, 261-62, 213 P.3d 728 (2009). Materiality addresses whether " 'a fact . . . has a legitimate and effective bearing on the decision of the case and is in dispute.' " *State v. Reid*, 286 Kan. 494, 505, 186 P.3d 713 (2008) (quoting *State v. Garcia*, 285 Kan. 1, 14, 169 P.3d 1069 [2007] ). Evidence is probative if it has " 'any tendency in reason to prove' " a fact. *Reid*, 286 Kan. at 505 (quoting K.S.A. 60-401[b]). We review a district court's determination that evidence is probative for abuse of discretion, whereas the district court's decision regarding materiality is reviewed de novo. *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010).

In making his argument regarding the admissibility of the stipulation, Boleyn fails to acknowledge that during trial the defense, not the State, was the party that made his sexual orientation an issue at trial. During opening statements, the State did not explicitly claim or suggest that Boleyn is gay, nor did it even mention that Valentine had questioned Boleyn about his sexuality prior to the couple breaking up. But during defense counsel's opening statement, defense counsel stated that Valentine had accused Boleyn of being gay, which caused him to move out of the couple's home. Later in the opening statement, defense counsel explicitly stated that "Dean Boleyn is not gay."

During the State's direct examination of Valentine, the prosecutor asked Valentine about the end of her relationship with Boleyn:

"Q. Tell us about the demise of your relationship. What happened?
"A. He and I's relationship between the two of us, our sexual relationship, was nonexistent and when I asked him why he wasn't interested in having sex with me; I asked him if he was gay, because I didn't know what was going on, or what was wrong.
"Q. How did he react to that?
"A. His exact words were, no, I don't think so.
"Q. Did he get angry at you?
"A. No, not really.
"Q. Is that what caused the demise of your relationship?
"A. He left three days after that, or three or four days after that."

Similarly, on cross-examination defense counsel questioned Valentine about asking Boleyn whether he was gay:

"Q. You asked [Boleyn] because of the lack of sexual relationship between you and he, you asked him if he was gay, right?
"A. Yes, ma'am.
"Q. Because in your mind if he wasn't having sex with you he must be gay?
"A. That wasn't the only reason. When I would try to initiate sex he would not be interested and/or there were several occasions he was not able to participate in sex and I just didn't feel that was a normal reaction of a 30-year-old male.
"Q. Did you tell him that?
"A. Did I?
"Q. Yeah.
"A. Early, early on [in] the relationship, yes, ma'am.
"Q. So you're saying the lack of sex between you and [Boleyn] was [Boleyn's] fault, and that's what led you to believe he must be gay?
"A. At the end of the relationship, yes, ma'am.
. . . .
"Q. Well, and you had done some research on the computer about it, too; is that true?
"A. About what?
"Q. Whether or not [Boleyn] was gay?
"A. No, ma'am, that's not true.
"Q. Did you—do [sic] tell him you had?
"A. No, ma'am, not that I recall.
"Q. The basis for your believing [Boleyn] was gay was because he wasn't having sex with you?

"A. Not only the not having sex but the fact that he, when I tried to initiate sex, or tried to get him interested, he still wouldn't. When I figured out that he wasn't going to initiate, I decided I would initiate and that still didn't work."

As these portions of Valentine's trial testimony indicate, the State did not introduce evidence during its case-in-chief to establish that Boleyn was gay for the purpose of damaging his credibility in front of the jury or to insinuate that Boleyn, because he is gay, was likely to have sexually abused T.V. If anything, Valentine's testimony established that Boleyn may have lacked sexual interest in Valentine, leading her to ask Boleyn whether he was gay. Essentially, the testimony offered an explanation of the tension that existed in the couple's relationship during that period of time.

We note that evidence of homosexuality is generally irrelevant and, thus, inadmissible at a trial involving the sexual molestation of a child. As a panel of our Court of Appeals aptly stated:

"It is no more reasonable to assume that a preference for same gender adult sexual partners establishes a proclivity for sexual gratification with same gender children than it is to assume that preference for opposite gender adult sexual partners establishes a proclivity for sexual gratification with opposite gender children." *State v. Blomquist*, 39 Kan. App. 2d 101, Syl. ¶ 2, 178 P.3d 42 (2008)

But when defense counsel specifically asked Boleyn during his direct examination whether he was gay and Boleyn answered no, the State was allowed to present evidence impeaching Boleyn's claim that he was not gay. See *State v. Johnson*, 258 Kan. 475, 481, 905 P.2d 94 (1995) ("We have recognized that when a defendant opens an otherwise inadmissible area of evidence during the examination of witnesses, the prosecution may then present evidence in that formerly forbidden sphere. [Citations omitted.]").

The State's purpose for introducing evidence establishing that Boleyn possessed homosexual pornography was not for the purpose of impeaching his credibility in general but for the purpose of showing that he had been untruthful when he stated at trial, under oath, that he was not gay. Accordingly, we construe the stipulation as evidence designed to impeach or rebut a claim Boleyn made during his direct examination testimony. See *State v. Sitlington*, 291 Kan. 458, Syl. ¶ 5, 241 P.3d 1003 (2010) ("Rebuttal evidence is that which contradicts evidence introduced by an opposing party.

It may tend to corroborate evidence of a party who first presented the evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or facts introduced by or on behalf of the adverse party.").

K.S.A. 60-420 states:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

Applying this provision in *State v. Blue*, 221 Kan. 185, 558 P.2d 136 (1976), we upheld the admission of such evidence, though it was collateral in nature and ordinarily not admissible. The case was an appeal from a conviction for forgery wherein defendant Blue had presented a forged drug prescription to a pharmacy in Wichita. This occurred during the afternoon of July 7, 1975. Defendant and a corroborating witness testified they had been at home all morning on July 7, 1975. The State offered evidence in rebuttal that the two of them had, in fact, visited another pharmacy during the morning hours and had obtained a quantity of drugs with a valid prescription. The trial court ruled the evidence, though collateral in nature and ordinarily not admissible, was admissible as rebuttal evidence going to credibility. We stated: "The rebuttal evidence was competent to show that the testimony of [the defendant and his witness] that they did not visit any other pharmacy that day was false; it was thus admissible to attack their credibility under K.S.A. 60-420." *Blue*, 221 Kan. at 188.

In *State v. Nixon*, 223 Kan. 788, 576 P.2d 691 (1978), the defendant appealed his convictions for rape and aggravated sodomy. At trial, the defendant attempted to admit evidence that the alleged victim had sold marijuana in order to show that she was not being truthful when she testified to the contrary at trial. Because the defendant did not deny having sex with the victim, the main issue at trial was whether the victim had consented to the sexual conduct; thus, the victim's veracity was at issue. The district court ruled that the sale of drugs was not a crime of dishonesty and, thus, the evi-

dence could not be admitted. The defendant argued that the evidence was not intended to establish traits of the complaining witness or specific instances of her conduct in order to impeach her character in general (see K.S.A. 60-422) but to establish that she was not being truthful in her testimony at trial. We reviewed K.S.A. 60-420 and related evidentiary rules and prior caselaw, including some cases holding that once inadmissible facts had been elicited, similar inadmissible evidence could be elicited to rebut the evidence. For example, we quoted from *Dewey v. Funk*, 211 Kan. 54, 56, 505 P.2d 722 (1973), where we stated that "the opponent may reply with similar evidence whenever it is needed for removing an unfair prejudice which might otherwise have ensued from the original evidence." After performing this review of the applicable law, we concluded in *Nixon* that "under the peculiar facts and circumstances in this case, . . . it was error to preclude the defendant from presenting evidence in an attempt to prove that the prosecuting witness had been untruthful in her testimony." *Nixon*, 223 Kan. at 794.

Like the defendant and his corroborating witness in *Blue* and the alleged victim in *Nixon*, Boleyn's credibility was placed at issue in this case after he decided to testify in his own defense. Consequently, evidence showing that he had lied during his direct examination would have a legitimate and effective bearing on the decision of the case and would therefore be material. Because Boleyn denied being gay during his direct examination, we conclude that evidence establishing that Boleyn is gay would be material to the issue of judging the credibility of his testimony.

But we hold that evidence of Boleyn merely possessing homosexual pornography would not be probative to rebutting or impeaching his claim of not being gay. Here, there is nothing in the record to suggest that mere possession of homosexual pornography establishes that the possessor of the pornography is gay. Furthermore, we question whether this proposed conclusion can even be drawn from the evidence at issue. The stipulation stated that in addition to possessing gay pornography, Boleyn also possessed heterosexual pornography. Thus, at the most, the evidence establishes that Boleyn may have had an interest in viewing both homosexual

and heterosexual pornography, but this conclusion is a far cry from the inference that Boleyn is exclusively attracted to or sexually active with men. See, *e.g.*, Weinberg, Williams, Kleiner & Irizarry, *Pornography, Normalization, and Empowerment*, 39 Arch. of Sex. Behav. 1389, 1391 (2012) ("We believe it is unassailable that the central function of pornography is the creation or enhancement of sexual fantasy and/or arousal. That is, it presents bodies, behaviors, and situations in a way that is intended to sexually inspire or excite the viewer, *regardless of whether such bodies, behaviors, and situations would be available or even desirable for the viewer to experience in real life.*" [Emphasis added.]).

Accordingly, we conclude that the district court erred in admitting the stipulation into evidence for the purpose of rebutting Boleyn's claim that he was not gay. This determination, however, does not automatically entitle Boleyn to a new trial. We must also determine whether the district court's erroneous admission of this evidence was harmless. The applicable harmless error standard is defined in K.S.A. 60-261. See *State v. Huffmier*, 297 Kan. 306, 315, 300 P.3d 669 (2013); *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013). That statute states:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." K.S.A. 60-261.

This statutory nonconstitutional harmless error analysis requires us to determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. See *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011) (comparing the more stringent test when the error infringes on rights protected by the United States Constitution), *cert. denied* 132 S. Ct. 1594 (2012). In this analysis, we are concerned only with undue or unfair prejudice. See *State v. Prine*, 287 Kan. 713, 736, 200 P.3d 1 (2009). The burden of demonstrating harmlessness un-

der K.S.A. 60-261 is on the State in this instance as the party benefiting from the error. *State v. McCullough*, 293 Kan. 970, Syl. ¶ 9, 270 P.3d 1142 (2012).

At oral argument, the court specifically addressed both parties regarding harmless error. The State maintained that even if we find error in the admission of the parties' stipulation, the error had little impact on the ultimate outcome of the trial. We agree. The most damaging evidence presented at trial was the audio recording of the phone conversation between Boleyn and T.V. During this conversation, Boleyn clearly expressed an awareness of the seriousness and the heinous nature of his conduct with T.V. Though the incidents were never described during the conversation, T.V.'s trial testimony and Boleyn's statements during the conversation expressing fear of going to jail for the rest of his life if Valentine ever found out about the activities clearly established that Boleyn engaged in the charged acts. Finally, we note that the jury's verdict—acquitting Boleyn of four of the five counts of aggravated indecent liberties with a child charged against him—shows that the jury carefully considered the evidence of each count and was not unduly swayed by the improperly admitted evidence. Therefore, we are convinced that there is not a reasonable probability that the improperly admitted evidence affected the outcome of the trial in light of the entire record.

### CONSTITUTIONALITY OF BOLEYN'S HARD 25 LIFE SENTENCE

Finally, Boleyn argues that the district court erred when it concluded that his hard 25 life sentence was constitutional. Before the district court, Boleyn argued that his sentence was unconstitutional based on the three factors found in *State v. Freeman*, 223 Kan. 362, 367, 574 P.2d 950 (1978):

"(1) The nature of the offense and the character of the offender should be examined with particular regard to the degree of danger present to society; relevant to this inquiry are the facts of the crime, the violent or nonviolent nature of the offense, the extent of culpability for the injury resulting, and the penological purposes of the prescribed punishment;

"(2) A comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses, and if among them are found more serious

crimes punished less severely than the offense in question the challenged penalty is to that extent suspect; and

"(3) A comparison of the penalty with punishments in other jurisdictions for the same offense."

Boleyn raises two arguments for why the district court's decision regarding the constitutionality of his sentence should be reversed. First, he argues that the district court's findings of fact and conclusions of law regarding the *Freeman* factors are insufficient for this court to properly review the district court's ultimate conclusion regarding the constitutionality of his sentence under *Freeman*. Accordingly, he argues that based on *State v. Seward*, 289 Kan. 715, 719-21, 217 P.3d 443 (2009), this court should vacate his sentence and remand the case to the district court so it can make sufficient factual findings and conclusions of law regarding each of the three *Freeman* factors. If this court determines that remanding the case for additional findings of fact and conclusions of law is unwarranted, then Boleyn argues in the alternative that application of the *Freeman* factors to the record presently before this court should lead to the conclusion that his sentence is disproportionate to his crime and, thus, unconstitutional.

As this court recently noted in *State v. Britt*, 295 Kan. 1018, 1032, 287 P.3d 905 (2012), the three-part *Freeman* test applies to constitutional challenges to sentences under § 9 of the Kansas Constitution Bill of Rights. In *Freeman*, this court recognized: "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." *Freeman*, 223 Kan. at 367.

"In determining whether a sentence is cruel or unusual under § 9 of the Kansas Constitution Bill of Rights, a district court must make both legal and factual inquiries. These inquiries invoke a bifurcated standard of review: without reweighing the evidence, the appellate court reviews the factual underpinnings of the district court's findings under a substantial competent evidence standard, and the district court's ultimate legal conclusion drawn from those facts is reviewed de novo." *Britt*, 295 Kan. 1018, Syl. ¶ 12.

No one factor of the *Freeman* test controls. "Ultimately, one consideration may weigh so heavily that it directs the final conclu-

sion. Before that conclusion is reached, however, consideration should be given to each prong of the test." *State v. Ortega-Cadelan,* 287 Kan. 157, 161, 194 P.3d 1195 (2008). This court also noted in *Ortega-Cadelan* that the first *Freeman* factor (*i.e.,* the nature of the offense and the character of the offender) is "inherently factual, requiring examination of the facts of the crime and the particular characteristics of the defendant" and that the second and third *Freeman* factors (*i.e.,* a comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses; a comparison of the penalty with punishments in other jurisdictions for the same offense) are legal determinations. *Ortega-Cadelan,* 287 Kan. at 161.

Boleyn argues that the district court's findings and conclusions regarding the *Freeman* factors are deficient because the district court merely adopted as its ruling the State's response to Boleyn's motion seeking to have his hard 25 life sentence declared unconstitutional. As a result of the alleged deficiencies in the district court's ruling, Boleyn suggests that this court remand the case for further findings pursuant to *Seward.*

In *Seward,* the defendant raised state and federal cruel and/or unusual punishment challenges during plea negotiations, in his motion for downward departure, and during his sentencing hearing, but the district court failed to make any findings regarding the *Freeman* factors. This court noted that appellate courts do not make factual findings but review those made by district courts. This court also noted, however, that there had been confusion in Kansas caselaw regarding whether the burden of assuring that findings were adequate for appeal fell on a party or on the district court. After discussion, this court concluded:

"Supreme Court Rule 165 (2008 Kan. Ct. R. Annot. 235) places the primary duty for arriving at adequate findings and conclusions on the district judge. A defendant who wishes to appeal on the basis of a constitutional challenge to a sentencing statute must, however, ensure that the findings and conclusions by the district judge are sufficient to support appellate argument by the filing of a motion invoking the judge's duty under Rule 165, if necessary." *Seward,* 289 Kan. 715, Syl. ¶ 3.

Despite the fact that the defendant in *Seward* had not taken steps to assure that adequate findings had been made, this court remanded the case for further proceedings, but cautioned:

"We emphasize that we believe this case to be exceptional. *In the future, a defendant who wishes to appeal on the basis of a constitutional challenge to a sentencing statute must ensure the findings and conclusions by the district judge are sufficient to support appellate argument, by filing of a motion invoking the judge's duty under Rule 165, if necessary."* (Emphasis added.) *Seward,* 289 Kan. at 721.

The outcome reached in *Seward (i.e.,* remand for factual findings and legal conclusions regarding the *Freeman* factors) is unavailable here because *Seward* was filed on October 2, 2009, more than a year prior to Boleyn's sentencing on December 17, 2010, and the filing of the journal entry of judgment on December 28, 2010. Accordingly, by the time of sentencing and the filing of the journal entry of judgment, Boleyn should have been aware that Seward's holding made him responsible for ensuring that the district court's factual findings and conclusions of law regarding the *Freeman* factors were adequate to support appellate review of his constitutional challenge to his sentence. Thus, even if we assume without deciding that the district court's factual findings are inadequate, Boleyn would bear the responsibility for the deficient findings and, consequently, would not be entitled to the same relief as given to the defendant in *Seward. Cf. State v. Berriozabal,* 291 Kan. 568, 592, 243 P.3d 352 (2010) (though district court failed to make specific findings regarding defendant's *Freeman* argument, district court's journal entry was filed prior to *Seward;* accordingly, defendant's case, pursuant to *Seward,* was remanded for entry of sufficient factual findings and conclusions of law regarding the *Freeman* factors). Thus, Boleyn's argument for remand pursuant to *Seward* is without merit.

Application of the *Freeman* factors to the record currently before this court indicates that Boleyn's sentence is constitutional. Regarding the first factor (the nature of the offense and the character of the offender), Boleyn argued before the district court that he was 31 years old and had no prior criminal history. He also noted that evidence was presented at trial establishing that the allegations of sexual abuse arose after he had been in a public altercation with Valentine. Finally, he noted that the jury acquitted him of four counts of aggravated indecent liberties with a child, indicating that

the jury did not believe T.V.'s testimony that the abuse occurred multiple times.

Regardless of the jury's reasons for acquitting Boleyn on four of the five counts, the jury rejected his denial of ever sexually molesting T.V., a child who was between the ages of 8 and 10 when the charged conduct occurred. As noted above, T.V. testified at trial that Boleyn used his finger to "poke" T.V.'s penis and that Boleyn would also touch T.V.'s penis with his mouth. T.V. also said Boleyn made him put his mouth on Boleyn's penis. T.V. said he would tell Boleyn to stop but Boleyn would say no and keep going. Finally, the transcript of Boleyn's trial establishes that he entered into a stipulation with the State in order to prevent evidence from being admitted at trial showing he possessed child pornography depicting young male children.

As this court recently stated in *State v. Woodard*, 294 Kan. 717, 722, 280 P.3d 203 (2012):

"The legislative intent underlying Jessica's Law is to protect children by removing perpetrators of sexual crimes against children from society. [Citation omitted.] The United States Supreme Court has observed that sex offenders represent a particularly serious threat in this country and that they are more likely than any other type of offender to commit violent crimes following their release. [Citation omitted.] The State therefore has a particularly compelling interest in using incarceration as a means of protecting its youth from sexual offenders."

Moving on to the second *Freeman* factor (a comparison of the punishment with punishments imposed in this jurisdiction for more serious offenses), Boleyn raises the same argument on appeal that he raised before the district court: aggravated indecent liberties with a child is less serious than homicide but is punished more severely. Even though the district court failed to address this legal question at sentencing, this court can still address the merits of Boleyn's argument on appeal. See *Britt*, 295 Kan. at 1032.

In *Woodard*, this court rejected the same argument that Boleyn raises here:

"This argument suffers from several flaws. In the first place, it assumes that murderers necessarily receive more lenient sentences in Kansas than violators of Jessica's Law. This is not the case. In fact, the Kansas Criminal Code sets out a list of transgressions that constitute capital murder, which is an off-grid offense.

K.S.A. 21-3439. Capital murder is subject to punishment by death. K.S.A. 21-4624. The penalty for homicide in Kansas may thus be much more severe than the penalties under Jessica's Law. See K.S.A. 21-4638; K.S.A. 21-4643. The fact that the penalty for certain categories of homicide may be less severe than the penalties for other, nonhomicide crimes does not automatically render the penalties for the nonhomicide crimes unconstitutional. There is no strict linear order of criminal activity that ranks all homicides as the most serious crimes and all nonhomicide crimes as less serious, with the corresponding penalties necessarily ranking in diminishing durations of imprisonment.

"Furthermore, as the State points out, Jessica's Law is not the only Kansas statute that provides for more severe penalties for nonhomicide crimes than for certain categories of homicide. Compare, *e.g.*, rape, K.S.A. 21-3502, and aggravated kidnapping, K.S.A. 21-3420, which are severity level 1 offenses, with reckless second-degree murder, K.S.A. 21-3402(b), which is a severity level 2 offense." *Woodard*, 294 Kan. at 723-24.

For the same reasons, we conclude that the penalty under K.S.A. 21-4643(a)(1)(C) is not disproportionately harsh when compared with the punishments imposed for homicide in Kansas.

Finally, in his brief on appeal, Boleyn fails to address the third *Freeman* factor (*i.e.*, a comparison of the penalty with punishments in other jurisdictions for the same offense). An issue not briefed by an appellant is deemed waived and abandoned. *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011). Additionally, in *State v. Easterling*, 289 Kan. 470, 487, 213 P.3d 418 (2009), this court concluded that an appellant's failure to brief all of the *Freeman* factors resulted in the issue not being presented "in a posture to be effectively decided" on appeal.

Based on the above analysis, we conclude that Boleyn has failed to show that his sentence is unconstitutional under *Freeman*. Accordingly, we affirm the district court's decision to impose a hard 25 life sentence upon Boleyn pursuant to K.S.A. 21-4643(a)(1)(C).

Affirmed.