NOT DESIGNATED FOR PUBLICATION

No. 116,001

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SAMUEL LUIS MERCED,
*Appellant*.


MEMORANDUM OPINION

Appeal from Geary District Court; MARITZA SEGARRA, judge. Opinion filed October 27, 2017.
Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., BUSER, J., and BURGESS, S.J.

PER CURIAM: In 2014 the State charged Samuel Merced with three counts of aggravated indecent liberties with a child, in violation of K.S.A. 2013 Supp. 21-5506(b)(3)(A); three counts of aggravated indecent solicitation of a child, in violation of K.S.A. 2013 Supp. 21-5508(b)(1); and three counts of lewd and lascivious behavior, in violation of K.S.A. 2013 Supp. 21-5513(a)(2). At trial, the district court allowed the State to present evidence of Merced's prior sexual offenses in accordance with K.S.A. 2014 Supp. 60-455(d) over Merced's objection. The district court also overruled Merced's objection to Detective Odell's testimony regarding the Finding Words of Kansas training he received and the protocol he used during his interview with A.P. The jury convicted

1

Merced of two counts of aggravated indecent solicitation of a child and one count of lewd and lascivious behavior. Merced timely appeals. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

H.P. and Merced met in 2004, while they both worked at Burger King. H.P. suggested to Merced that they have a baby together. Merced agreed, and together they decided Merced would have no role in the child's life. Part of their agreement also relieved Merced of any duty to pay child support. Their child, A.P., was born in 2006.

After expressing curiosity about her father to H.P., A.P. and Merced started seeing each other more frequently. Merced usually visited A.P. at her and H.P.'s apartment, and H.P. testified that although Merced would be at their apartment so he could visit his daughter, "they didn't really do much." Rather, H.P. and Merced "engage[d] in conversation" while he would "watch [A.P.] while she played with toys or something."

Although Merced reached out to H.P. so he could see A.P., there was little consistency or routine in the visits. H.P. testified that she and Merced established a cycle where he would call or text H.P. asking to see A.P. and they would set a time to meet, but then Merced "usually wouldn't show." H.P. became upset whenever this happened, so she and Merced "had words [and then] wouldn't talk for a few months." H.P. testified that this happened repeatedly, but she continued agreeing to meet Merced because A.P. "wanted to see her dad."

In late 2013, Merced and H.P. began dating each other in a "romantic" and "committed" relationship. During their romantic relationship, Merced and H.P. never lived together. Instead, Merced lived with his two sons (who were 7 and 10 years old at the time of trial), his mother, grandmother, aunt and uncle and their children, sister and her children, and brother. Shortly after the two started dating, H.P. and Merced discussed

2

potentially moving in together. H.P. testified that Merced's sister told her Merced would not be able to move in with H.P. and A.P. because Merced was a registered sex offender. H.P. testified she knew Merced was a sex offender and that she would lose her Section 8 benefits if he moved in with her and A.P.

Before Merced and H.P. became romantically involved with each other, H.P. worked full-time and often relied on her mother to watch A.P. Once their relationship changed, Merced would help watch A.P. while H.P. worked. Sometimes Merced watched A.P. at her apartment and other times Merced watched her at his home. Also, Merced usually watched A.P. at her apartment on the one night per week that H.P. worked in the evening. During the trial, H.P. testified that she could not remember if A.P. and Merced were ever alone together during any of her and A.P.'s visits with Merced.

On June 30, 2014, H.P. and A.P. went to visit H.P.'s friend, Kelly Stevens, to swim in Stevens' pool. H.P. was scheduled to see a patient that evening, so Merced watched A.P. After they finished swimming, H.P. told A.P. they needed to hurry home so they could meet Merced at their apartment, where he would watch A.P. for the evening. A.P. responded by asking if her half-brothers were going to join Merced—a question H.P. testified was normal for A.P. to ask. H.P. then told A.P., "No, you know when Daddy comes in the evening, it's just him." A.P. then asked H.P. if her half-brothers could come over, to which H.P. said, "[N]o." A.P. asked H.P. again if her half-brothers could come over with Merced. After H.P. told her no for the final time, H.P. testified A.P. "looked down at the floor, [then] she looked back up at me and said, well, are you sure my Daddy's not going to make me do adult stuff[?]" When H.P. asked A.P. what she meant by "adult stuff," A.P. "started to cry. And she said, adult stuff, I can't talk about that. She said, other adults talk about that."

H.P. testified that after pressing A.P. for more information, A.P. stated Merced had never touched her, but that "he asked [her] to put lotion on him." H.P. asked A.P. for

3

clarification, and H.P. testified to the following conversation between her and A.P.: "[Merced] asked me to squirt lotion on him. I said, did you. Well, he asked me to. I said, you're not in trouble for anything. Did you, though. And she said yes. I said, did he ask you to touch him. He did, but I told him no."

A.P. further disclosed to H.P. that this event took place at her and H.P.'s apartment, and A.P. said it happened three times.

Shortly after this initial conversation, H.P. asked A.P. if she understood what she was saying was serious—"like, calling the police serious." H.P. explained she wanted to make sure A.P. was telling the truth so "if somebody didn't do something, that they wouldn't, you know, go to jail for something that they didn't do." A.P. said she understood, and confirmed that "[Merced] did it." H.P. then proceeded to cancel her evening patient and contacted the police.

H.P. made initial contact with the law enforcement officers that evening and again the next morning, July 1, 2014, when H.P. and A.P. went to the police station to file a police report. They met with Detective Cory Odell, who interviewed A.P. and H.P. separately. Detective Odell testified when he interviewed A.P., she told him that "someone had made her touch the private parts, which is how she described the penis region." When Detective Odell asked A.P. who did that, she responded that it was her dad. Detective Odell then asked A.P. to tell him what happened, and he testified A.P. stated:

> "[W]hile her dad was at her residence, he told her to go get the lotion. She went and retrieved the lotion. And when she came back to her dad, he told her to squirt the lotion on his private parts, and then told her to rub it on. [A.P.] told me, at that point, she told him no, and did not rub the lotion on, at which point, her dad proceeded to rub the lotion on himself. She told me that that was done in an up and down motion. And then she was allowed to return to whatever she was doing prior."

4

A.P. told Detective Odell that these events occurred three times. Finally, A.P. told Detective Odell that Merced made her watch inappropriate videos when they were together.

The State charged Merced with three counts of aggravated indecent liberties with a child, in violation of K.S.A. 2013 Supp. 21-5506(b)(3)(A); three counts of aggravated indecent solicitation of a child, in violation of K.S.A. 2013 Supp. 21-5508(b)(1); and three counts of lewd and lascivious behavior, in violation of K.S.A. 2013 Supp. 21-5513(a)(2).

*Pretrial Proceedings*

During the pretrial proceedings, the State filed a motion to introduce K.S.A. 2014 Supp. 60-455(d) propensity evidence of Merced's prior sexual offenses—specifically, the State motioned to introduce his 2001 conviction from an *Alford* plea for aggravated indecent solicitation of D.T., a child under 14 years old and other evidence pertaining to that prior sexual misconduct. See *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). Merced objected to admission of the K.S.A. 2014 Supp. 60-455(d) evidence. At a hearing on the motion, Merced primarily argued that the evidence was more prejudicial than it was probative. The district court ruled the State's evidence be admitted because it was more probative than it was prejudicial.

Merced also filed a motion requesting a pretrial ruling on the admissibility of Detective Odell's testimony regarding his training for interviewing children. Detective Odell was trained in the Finding Words of Kansas program which is used by Kansas law enforcement in child abuse investigations. At the pretrial hearing on Merced's motion, Kelly Robbins—the executive director of Finding Words of Kansas and the Western Kansas Child Advocacy Center—testified that the goal of the program is to ensure that a

5

child abuse victim does not have to give multiple interviews during an investigation. Robbins further explained that the Finding Words program takes a

> "multidisciplinary team approach[, meaning that] in a child abuse investigation, it really takes all of the different parties such as law enforcement, child protective services, mental health, medical, [and] county attorneys working together to put [the] case together. . . .
>
> "And so when an interview happens . . . the idea is that those team members that are working [on] that case, come together and are present not in the room, but observing the interview and have input for that—during that interview . . . ."

Merced's contention is that the testimony regarding the Finding Words program is irrelevant: "[T]he jury doesn't need an education regarding Finding Words to understand what [A.P.] told Detective Sergeant Odell." Merced further explained that "the inference of the testimony about Finding Words . . . is to make what [A.P.] says seem more credible," and introducing evidence of the Finding Words protocol "is nothing but an improper bolstering [of] what the witness has said."

After hearing both sides, the district court found that testimony regarding Finding Words protocol as potentially helpful to a jury. The district court specifically explained Detective Odell's testimony regarding how he used Finding Words to interview A.P. was no different than "any time a police officer gets on the stand and testifies about what they did, when they talked to a witness."

At trial Merced renewed his initial objections and requested continuing objections to the State's introduction of K.S.A. 60-455 evidence of Merced's prior sexual misconduct. The district court granted the continuing objections and adopted its rulings from the pretrial hearing, thus admitting the following:  D.T.'s testimony regarding Merced's sexual offenses against her; Dr. Bonnie Catterson's testimony regarding the

6

injuries D.T. incurred as a result of her sexual assault by Merced; written evidence pertaining to D.T.'s sexual assault; and evidence of Merced's prior conviction.

Merced also renewed his objection to Detective Odell's testimony regarding his use of Finding Words protocol while interviewing A.P. The district court relied on its finding during the pretrial hearing and admitted the testimony.

The jury acquitted Merced on all three counts of aggravated indecent liberties, one count of aggravated indecent solicitation, and two counts of lewd and lascivious behavior and convicted Merced of two counts of aggravated indecent solicitation of a child and one count of lewd and lascivious behavior. Shortly after the trial concluded, Merced filed a motion to set aside his verdict. The district court denied his motion and sentenced Merced to a total of 185 months in prison followed by lifetime postrelease supervision.

Merced timely appeals.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE OF MERCED'S PRIOR SEXUAL MISCONDUCT?

Merced first argues that the district court erred in admitting evidence of his prior sexual misconduct with a child under K.S.A. 2014 Supp. 60-455(d) because: (1) the evidence was not relevant; and (2) it was more prejudicial than it was probative.

In this case, the State filed a pretrial motion to admit K.S.A. 60-455 evidence of Merced's prior sexual offenses against D.T. to prove that Merced had the propensity to sexually assault young girls. After hearing both sides at a pretrial hearing on the motion, the district court admitted the evidence. At trial Merced renewed his objection to the evidence. The district court relied on its pretrial findings and admitted the evidence.

7

K.S.A. 60-455 generally prohibits prosecutors from using propensity evidence against defendants. See K.S.A. 2014 Supp. 60-455. But in 2009, our legislature amended K.S.A. 60-455 to add subsection (d) which permits the use of prior bad-act evidence in sex crime prosecutions. This statutory amendment does not limit the purpose for which propensity evidence may be used. K.S.A. 2014 Supp. 60-455(d). Rather, it broadly permits evidence of other acts or offenses of sexual misconduct to be admitted in such a prosecution "for its bearing on any matter to which it is relevant and probative." K.S.A. 2014 Supp. 60-455(d).

In *State v. Prine*, 297 Kan. 460, 476-77, 303 P.3d 662 (2013), our Supreme Court relied on Kansas Legislative Committee minutes and testimony to explain how the K.S.A. 60-455 amendment was intended to align with the Federal Rules of Evidence Rules 413 and 414. Federal Rule 413 states in part that "[i]n a criminal case in which a defendant is accused of a sexual assault, the court may admit evidence that the defendant committed any other sexual assault. The evidence may be considered on any matter to which it is relevant." Fed. R. Evid. 413(a). Likewise, in cases where the defendant is accused of child molestation, Federal Rule 414(a) allows "the court [to] admit evidence that the defendant committed any other child molestation. The evidence may be considered on any matter to which it is relevant." Here, the State's case and its introduction of prior offense evidence against Merced is exactly what the Kansas Legislature had in mind when amending K.S.A. 60-455 to mirror the Federal Rules.

In *State v. Remmert*, 298 Kan. 621, 627-28, 316 P.3d 154 (2014), our Supreme Court confirmed that the new subsection (d) allows prosecutors to introduce evidence of prior sexual misconduct, explaining that propensity evidence is material in sex offense cases because the evidence has a legitimate and effective bearing on defendants' guilt. Although K.S.A. 2014 Supp. 60-455(d) permits the admission of prior sexual misconduct to prove propensity, the evidence still must pass the threshold test for all evidence— whether the evidence is relevant to the issue at hand. Thus, the first step in an appellate

8

review of a district court's decision to admit prior offense evidence is to determine whether the evidence is relevant. *State v. Franklin*, 280 Kan. 337, 340, 121 P.3d 447 (2005).

Relevant evidence is (1) material, meaning the evidence must pertain to a disputed fact or issue; and (2) probative, meaning it has a tendency to prove a material fact or issue in the case. The appellate court will review the issue of materiality de novo. *State v. Boleyn*, 297 Kan. 610, 622, 303 P.3d 680 (2013).

The disputed issue in this case is whether Merced committed the charged sexual offenses against A.P. For the State's K.S.A. 2014 Supp. 60-455(d) evidence that Merced molested D.T. to be material in this case, the events that occurred with D.T. must be related to the sex crimes charged. In *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014), our Supreme Court put to rest any future contention that evidence of a defendant's prior sexual misconduct is immaterial in a subsequent sexual misconduct prosecution. In that case, the State charged Bowen with five counts of various sex crimes that he committed against a 14-year-old girl. On appeal, Bowen argued that the district court erred by admitting evidence of his prior sexual misconduct against a 12-year-old girl.

In the Supreme Court's opinion, it took special note of the similarities between Bowen's prior crimes and the crime at issue on appeal. That court relied on multiple cases to support its conclusion that "[i]n sex offense cases, propensity evidence is material, *i.e.*, has a 'legitimate and effective bearing' on defendants' guilt." *Bowen*, 299 Kan. at 349; see *Remmert*, 298 Kan. at 627-28 (Evidence of the defendant's prior diversion for a sex crime against a young girl was relevant to the defendant's guilt in the State's case against the defendant for sex crimes against a young boy.); *State v. Spear*, 297 Kan. 780, 789, 304 P.3d 1246 (2013) (The victim's allegations that the defendant had previously molested her would have been admissible propensity evidence in a later prosecution for aggravated indecent liberties involving same victim.); *Prine*, 297 Kan. at 480 (Evidence that the defendant previously sexually abused his daughter and younger sister was admissible as

9

propensity evidence in the State's case against the defendant in a subsequent sex crime.). The evidence was probative of Bowen's propensity to commit the acts alleged by the victim because the prior crimes were sufficiently similar to the victim's allegations. *Bowen*, 299 Kan. at 349.

Here, the State introduced the evidence to prove Merced's propensity to commit sex crimes. Our Supreme Court already determined evidence like the State introduced against Merced is material, but its material value is apparent even without Kansas caselaw. Since Merced was charged with sex crimes, any allegation that he previously committed other sex crimes is necessarily related, and thereby material, because of its bearing on the defendant's guilt. Indeed, both the Supreme Court and individual analysis indicates that evidence of Merced's abuse of D.T. is material because it bears on whether Merced is guilty of sexual misconduct with A.P.

After determining whether the evidence is material, an appellate court must decide whether the district court abused its discretion in finding the evidence was probative. *Boleyn*, 297 Kan. at 622. A district court abuses its discretion if no reasonable person would agree with its decision or if its decision is based on an error of law or fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

Again, in *Bowen*, our Supreme Court determined that the State's evidence of the defendant's prior sex offenses was sufficiently probative of the defendant's "propensity to commit the acts alleged by [the victim]." 299 Kan. at 349. There, our Supreme Court considered the parallels that the victims were of similar ages when the offenses occurred, and the court considered the similarities between the crimes—specifically that each of the crimes "involved sexual acts or preparatory actions toward sexual acts with young girls"—to reach its conclusion that the evidence of prior sexual offenses was probative. 299 Kan. at 349.

10

The district court in this case analyzed the allegations against Merced using a similar framework to the one presented in *Bowen*. The district court also considered how both D.T. and A.P. were young girls when Merced committed the charged offenses against them. The district court also noted similarities between the circumstances under which Merced's acts with D.T. and A.P. occurred, specifically pointing to the fact that in both cases Merced abused the girls while he was babysitting them.

Relying on the logic set forth in *Bowen* that Merced's prior crimes against D.T. involved sexual acts with young girls, it is reasonable to believe that "these crimes made more probable the truth of the State's proposition that [Merced] had a disposition to sexually abuse female victims approximately the same age as [A.P.]" 299 Kan. at 349-50.

Even without *Bowen*'s guidance, a reasonable person could independently view the State's evidence that Merced molested D.T. and draw an inference that since Merced committed prior offenses against D.T., it was more likely than not he also molested A.P. The district court properly determined that the State's evidence was probative. Since the State's evidence of Merced's prior sexual misconduct is both material and probative, it follows that the evidence is relevant and Merced's assertion to the contrary is incorrect.

Merced also contends that the district court wrongfully admitted the State's K.S.A. 2014 Supp. 60-544(d) evidence of prior sexual offenses, claiming that the evidence was more prejudicial than it was probative.

The State's evidence of Merced's prior offenses is relevant to his propensity to commit sex crimes. Thus, the second step in determining whether the district court abused its discretion is to decide whether the probative value of the State's evidence outweighed its prejudicial effect. 299 Kan. 339, Syl. ¶ 7. A district court abuses its discretion if no reasonable person would agree with its decision or if its decision is based on an error of law or fact. *Marshall*, 303 Kan. at 445.

11

The Tenth Circuit has provided factors to consider when balancing the potential of prejudice with the probative value of propensity evidence. These factors—which the United States Supreme Court has cited with approval—include: "1) how clearly the prior act has been proved; 2) how probative the evidence is of the material fact it is admitted to prove; 3) how seriously disputed the material fact is; and 4) whether the government can avail itself of any less prejudicial evidence." *United States v. Enjady*, 134 F.3d 1427, 1433 (10th Cir. 1998).

Here, Merced relies on these factors to support his claim that the State's evidence of his prior offenses is more prejudicial than probative. First, Merced contends the State's evidence he abused D.T. is minimally probative because it was "[n]ot clearly proved." Specifically, Merced argues against the probative value of D.T.'s testimony because she "admitted she did not remember much of the abuse she claimed occurred." In essence, Merced claims the offenses against D.T. were not "clearly proved" because D.T. was too young to have a vivid recollection and, thus, present an accurate testimony of the alleged offenses.

Determining whether a witness is credible is up to the jury, and in making a decision about credibility the jury has the authority to consider "what [they] see as well as what they hear, and the natural and logical inferences that flow from both . . . ." *State v. Todd*, 299 Kan. 263, 286, 323 P.3d 829 (2014). Regardless of whether D.T.'s testimony was not credible, evidence of Merced's prior offenses was not limited to just this testimony. The State also presented evidence from a physician who testified to D.T.'s injuries, as well as a journal entry of Merced's prior conviction for aggravated indecent solicitation of a child—the same offense that the jury convicted Merced of here.

Merced also argues the crimes against D.T. were not clearly proved because Merced's prior conviction was the result of an *Alford* plea "which, by its very terms, means the defendant denies the truth of the allegations against him." This is a

12

mischaracterization of an *Alford* plea. An *Alford* plea does not require the defendant to affirmatively deny allegations against him, like Merced claims. Rather, an *Alford* plea is simply a plea of guilt without affirmatively admitting to the crime. *State v. Case*, 289 Kan. 457, 462, 213 P.3d 429 (2009). Merced's contention seems to be that his prior conviction lacks evidentiary value since the State never proved the acts beyond a reasonable doubt to a jury or judge. But in addressing how thoroughly a prior act must be proved, the *Enjady* court indicated that a district court "must make a preliminary finding that a jury could reasonably find by a preponderance of the evidence that the 'other act' occurred." 134 F.3d at 1433. This is echoed in *Case*, where our Supreme Court explained a sufficient basis for an *Alford* plea consists of "facts presented by the State . . . to prove guilt by a reasonable doubt to a jury . . . ." 289 Kan. at 468. Thus, Merced is incorrect when he states that his *Alford* plea does not sufficiently prove the allegations against D.T. Indeed, although Merced did not admit guilt in his *Alford* plea, by accepting the plea he also accepted the fact that the State could prove his guilt beyond a reasonable doubt. This degree of proof is sufficient per *Enjady*. See 134 F.3d at 1433.

Second, Merced argues the State's evidence that he molested D.T. does not prove Merced committed the charged sexual offenses against A.P. The primary basis of this contention is that the prior offense is too dissimilar from the current allegations to merit any probative value, claiming that the cases lacked any likeness beyond the fact that both involved "sex crimes against pre-teen girls."

Merced's argument is not persuasive. First, Merced argues D.T.'s allegations are too different from A.P.'s to be probative. In D.T.'s case Merced entered an *Alford* plea for aggravated indecent solicitation of a child, which is one of the two crimes for which the jury convicted Merced in this case. Merced ignored this fact in his brief and instead points out the abuse that D.T. alleges was far more extensive and serious than the abuse A.P. claims. Merced directs this court's attention to the fact that

13

"[D.T.] testified that [Merced] touched her 'everywhere, from head to toe.' . . . Specifically, she claimed that he used his hand and his penis to touch her vagina and her butt. [A.P.] made no allegations that [Merced] touched her, tried to touch her, asked her to touch her, or in any way seemed to be interested in touching her with his penis, his hands or any part of his body."

Curiously, Merced somehow concludes that the more serious nature of D.T.'s allegations preclude the State's evidence from proving he molested A.P. because A.P.'s accusations were less serious. The acts that Merced points out in his brief align with the acts K.S.A. 2013 Supp. 21-5506(a)(1) (indecent liberties with a child; aggravated indecent liberties with a child) prohibits—including "lewd fondling or touching of the person of . . . the child." Affirmatively pointing out evidence that Merced committed a more serious sex offense against D.T. in order to prove that he could not have committed a lesser offense against A.P. does not work in his favor. Instead, it actually provides a solid foundation that Merced has the propensity to commit the crimes of which he was convicted, as well as crimes that are more severe.

The district court stated there was sufficient similarity in the two cases, pointing out: "the age of . . . both victims, although they [were] not the same, [were] close to each other. They [were] very young children. The situation where [the offenses] occurred and the circumstances, the baby-sitting circumstances that are attributed to both of these. Of course, also very similar." These comments indicate the district court weighed the State's evidence Merced molested D.T. and determined the evidence was probative that he also molested A.P. This conclusion was reasonable.

The third *Enjady* factor pertains to how heavily disputed the material fact in our case is. Caselaw indicates that "[t]he more seriously disputed the material fact, the more heavily this factor weighs in favor of admissibility." *United States v. Sturm*, 673 F.3d 1274, 1286 (10th Cir. 2012). Here, this case is entirely premised upon the dispute of whether Merced sexually assaulted A.P. Since the State offers the K.S.A. 2014 Supp. 60-

14

455(d) evidence to prove this material fact, caselaw supports the admissibility of evidence regarding Merced's prior offenses.

Here, Merced addresses this factor incorrectly. Rather than discuss the dispute of the material fact in our case—whether he sexually abused A.P.—Merced instead discusses the dispute regarding the facts of his prior offense against D.T.

As per the fourth and final *Enjady* factor, Merced concedes that there is no other less prejudicial evidence of which the State could avail itself in order to prove Merced's propensity to commit sex crimes. The application of the *Enjady* factors supports the district court's conclusion that the State's evidence of Merced's prior offense was properly admitted. But even if not all of the *Enjady* factors were satisfied, the State's evidence would still be admitted in light of caselaw indicating that "evidence of prior sexual abuse should rarely be excluded" in cases where the defendant is being tried for subsequent sexual offenses. *State v. Dearman*, No. 110,798, 2014 WL 3397185, at *7 (Kan. App. 2014) (unpublished opinion) (citing *United States v. Benally*, 500 F.3d 1085, 1090 [10th Cir. 2007]).

A defendant will frequently be prejudiced whenever a prior offense is admitted as evidence against him or her. But rather than eliminate all prejudice, our law provides limited protection to defendants from evidence that produces undue prejudice. See *State v. Vasquez*, 287 Kan. 40, 53, 194 P.3d 563 (2008). Thus, in order to prove that a district court abused its discretion, a defendant must show that admitting the evidence would "'contribute to an improperly based jury verdict or distract from the central issues at trial.'" *State v. Longbine*, No. 114,611, 2016 WL 7429305, at *8 (Kan. App. 2016) (unpublished opinion) (quoting *State v. Moore*, No. 109,787, 2014 WL 4231237, at *13 [Kan. App. 2014] [unpublished opinion], *rev. denied* 302 Kan. 1018 [2015]).

15

Here, Merced claims the evidence of his prior sexual offenses "could lead jurors to determine that [he] had committed the crime against [A.P.], regardless of the weakness of the State's case. [Especially because] the prior allegations are so much more violent and disturbing than the current allegations." The State responds by pointing out the jury convicted Merced on only one-third of the charges despite the State's propensity evidence against him.

In cases similar to the present case, panels from this court have found that there was no undue prejudice when juries acquitted their respective defendants of at least some of the charged crimes—even after hearing evidence of prior sex offenses committed by the respective defendants. See *Longbine*, 2016 WL 7429305, at *8; *Moore*, 2014 WL 4231237, at *13.

The record indicates the district court considered all of the evidence and made a reasoned decision to admit the State's evidence of Merced's prior sexual misconduct.

The district court acknowledged its responsibility to determine whether the evidence was relevant and probative and whether it was more prejudicial than probative. Likewise, the district court pointed out that admitting Merced's prior conviction would naturally result in some prejudice, but the recited facts and the court's analysis still supported its conclusion the evidence was more probative than prejudicial. The district court specifically found that:

> "the age of . . . both victims, although they [were] not the same, [were] close to each other. They [were] very young children. The situation where [the offenses] occurred and the circumstances, the baby-sitting circumstances that are attributed to both of these. Of course, also very similar. And the Court believes that based . . . on the argument of the State, based on the prior conviction, the new charges before the Court, and the case law and the statute and the Court weighing this, the Court believes that the prior conviction should come in and will allow it to do so."

The district court performed a balancing test by which it found the evidence of Merced's prior sex offenses to be more probative than prejudicial. A reasonable person who heard the evidence from both Merced and the State could reach the same conclusion. Thus, the district court did not abuse its discretion by admitting evidence based on its conclusion that the State's evidence was more probative than prejudicial.

### DID THE DISTRICT COURT ABUSE ITS DISCRETION BY ALLOWING DETECTIVE ODELL TO TESTIFY ABOUT THE FINDING WORDS OF KANSAS TRAINING HE RECEIVED AND THE INTERVIEW PROTOCOL USED DURING HIS INTERVIEW OF A.P.?

Merced's second contention is that the district court improperly allowed Detective Odell to testify about the Finding Words of Kansas training he received on how to interview children. Merced argues Detective Odell's training was irrelevant to testimony about his interviews with A.P., and the detective's training improperly bolstered A.P.'s testimony.

The first step in our analysis of whether the district court properly admitted Detective Odell's Finding Words testimony is whether this testimony is relevant. Relevant evidence is (1) material, meaning the evidence must pertain to a disputed fact or issue; and (2) probative, meaning it has a tendency to prove a material fact or issue in the case. *Boleyn*, 297 Kan. at 622. An appellate court reviews the issue of materiality de novo, without deferring to the district court. When reviewing the probative value of evidence, an appellate court will only reverse if the district court abused its discretion. 297 Kan. at 622. A district court abuses its discretion when no reasonable person would agree with its decision or if its decision is based on an error of law or fact. *Marshall*, 303 Kan. at 445.

The disputed issue in this case is whether Merced committed the charged sex crimes against A.P. Thus, for Detective Odell's Finding Words testimony to be material and probative it must relate to whether Merced committed the acts of which he is

17

accused. It must tend to prove whether Merced committed the charged crimes. See *Boleyn*, 297 Kan. at 622.

Detective Odell interviewed A.P. about the crimes Merced allegedly committed against her. In that interview, A.P. stated Merced molested her, so the interview is material because it has a bearing on the jury's determination as to whether Merced indeed molested A.P. Likewise, the interview is probative because it reflects on A.P.'s initial accusations against Merced which served as the State's basis to prosecute him. The State would have no reason to prosecute Merced but for A.P.'s initial disclosure to H.P. regarding Merced's abuse. Since A.P. made the same accusations against Merced in her interview with Detective Odell as she did in her initial disclosure to H.P., it follows that Detective Odell's testimony about his interview with A.P. tends to prove that Merced did assault A.P. Thus, Detective Odell's testimony regarding his interview of A.P. is relevant.

While Detective Odell's testimony is relevant, the issue on appeal is whether the Finding Words training testimony is also relevant. When analyzing the relevance of the Finding Words testimony, it is important to note that the State's case against Merced is premised almost entirely on A.P.'s claims against Merced. There were no additional witnesses who testified to Merced's abuse of A.P. Nor was there any physical evidence of A.P.'s injury. As Merced explains in his brief: "[This] case turned on whether the jury believed [A.P.]" In other words, the case depended on the credibility of A.P.'s testimony, so A.P.'s credibility was both material and probative.

Thus, the issue is whether Detective Odell's testimony as to his Finding Words training and use of its protocol during A.P.'s interview had any bearing on A.P.'s credibility as a witness. Our Supreme Court explained how evidence pertaining to a witness' education was

18

> "a part of the basic background information provided by any witness. . . . Adult witnesses are frequently asked about their education, even when they are not testifying as experts. A person's educational background gives the jury an idea of how that person views and experiences the world, which helps jurors determine how much credibility to give each witness. As such, the evidence is relevant." *State v. Cline*, 295 Kan. 104, 111, 283 P.3d 194 (2012).

In short, the *Cline* court found that a witness' background information—including his or her education—is relevant.

First, *Cline* forecloses Merced's argument that a lay witness' testimony as to his or her educational and training background is unnecessary. See 295 Kan. at 111. In reality, *Cline* supports the opposite conclusion in cases where the jury's decision depends almost entirely on its perception of the victim/witness' credibility. Testimony about a witness' background and training could be outcome determinative. Based on *Cline*, Detective Odell's Finding Words testimony could assist jurors' evaluation of A.P.'s credibility because the testimony helps the jury understand why the detective asked A.P. the questions he did. The district court was not wrong in concluding the jury should know the strategy behind the Finding Words protocol. A.P.'s responses to Detective Odell's questions directly pertain to her credibility. Since A.P.'s credibility is outcome determinative in this case, the Finding Words testimony passes the first evidentiary threshold test of relevance.

But even if the district court erroneously admitted Detective Odell's Finding Words testimony, a reviewing court will not set aside a jury's verdict if the district court's error was harmless. K.S.A. 2016 Supp. 60-261.

An error is harmless if the error did not affect a party's substantial rights—meaning that it did not impact the trial's outcome. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). If the error involves a right guaranteed by the United States

19

Constitution, the reviewing court must be persuaded beyond a reasonable doubt that the error had no impact on the trial's outcome. If a constitutional right is not at issue, then this court must be persuaded only that there is no reasonable probability that the error affected the trial's outcome. 292 Kan. at 565.

Here, Merced's constitutional rights are not at issue. Rather, Merced contends the district court erred by admitting the Finding Words testimony, and that

"[h]aving Officer Odell testify about using an official protocol on which he received training improperly bolstered [A.P.]'s testimony [because a] jury, having heard testimony that the police department trains its officers in a certain way, would naturally believe that the training would lead to a more reliable statement than if she was merely telling the story to the officer or her mother."

More simply put, Merced believes that Detective Odell's Finding Words testimony somehow impermissibly made A.P.'s answers during the interview more authentic.

During Detective Odell's testimony he never stated if he did or did not believe A.P., and the detective never alluded to the reliability or lack thereof of the Finding Words protocol. In fact, Merced only objected once during Detective Odell's entire testimony regarding his interview with A.P. on the basis that the detective was "giving opinions."

There is nothing in the record on appeal to indicate Detective Odell's Finding Words testimony did anything but provide a factual basis of how he conducted his interview with A.P. Likewise, Merced does not identify anything in the record that the Finding Words testimony swayed the jury's decision, nor does he present caselaw upon which to base his theory.

20

Further, the State's case did not depend solely on Detective Odell's testimony. Even if the district court had committed an error, the error was harmless because there was extensive evidence the jury could have relied on to convict Merced. Without either the Finding Words testimony or Detective Odell's testimony in its entirety, the jury still heard A.P.'s personal testimony, A.P.'s mother's and her friend's testimony, and the State's evidence of Merced's prior sexual misconduct. It should also be noted the jury viewed the video of Detective Odell's interview with A.P. during deliberations without objection. The State presented abundant evidence against Merced. There is nothing in the record to indicate that the alleged error affected the jury's decision to convict Merced.

Affirmed.

* * *

ATCHESON, J., concurring:  Defendant Samuel Merced has raised no issues requiring reversal of his convictions or any other relief. I, therefore, concur in the result the majority reaches in affirming those convictions.