NOT DESIGNATED FOR PUBLICATION

No. 116,669

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEVEN TERRY JORDAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Barton District Court; RON SVATY, judge. Opinion filed January 12, 2018. Reversed and remanded with directions.

*Samuel Schirer*, of Kansas Appellate Defender Office, for appellant.

*Douglas A. Matthews*, assistant county attorney, *Näna N. Brammer*, assistant county attorney, *Amy J. Mellor*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., LEBEN and POWELL, JJ.

POWELL, J.: Steven Terry Jordan was convicted by a jury of his peers of rape, aggravated burglary, and criminal damage to property. Jordan now appeals his convictions and sentences, arguing that (1) the district court violated his constitutional right to present his theory of defense by excluding relevant evidence, (2) the State committed prosecutorial error, (3) the district court erred in calculating his criminal history, and (4) cumulative error deprived him of a fair trial. Because we agree that Jordan was denied his right to present his defense, we reverse his convictions, vacate his sentences, and remand for a new trial. We need not address his other issues on appeal.

1

Around 1:30 a.m. on February 6, 2013, in Great Bend, Kansas, A.W. was preparing to go sleep. She had worked at a nearby gas station that evening and had just sent her cousin home because it was late. About 10 minutes after getting into bed, A.W. heard footsteps on her front porch and a loud banging at her front door, as if someone was kicking it in. A.W. turned on her light, picked up her cell phone, and dialed 911. As the operator spoke, she hung up her phone because she saw a black male standing in her house.

The man wore a hooded jacket that covered most of his face; he had on sweat pants and carried a knife in his hand. He asked A.W. for money, and A.W. asked him who he was and why he was in her house. The man did not answer but entered her bedroom and told her to get on the bed. A.W. complied because she was scared. The man got on top of A.W. and placed the knife above her head. A.W. could see some of his face and thought she recognized him as someone who came to the gas station. The man took his pants off, penetrated A.W. with his penis, and groped her breasts. When he was done, he covered her face with a blanket, picked up his knife, and walked out of the room. The man told A.W. not to look at him and not to call the cops. A.W. did not move until she heard him exit the front door. Then, A.W. dressed herself; grabbed her purse, phone, and car keys; went out the back door; and got into her truck. She locked the doors and dialed 911.

Earlier that night, the Great Bend Police Department sent Officer Adam Hales to investigate a 911 call which was abruptly terminated—it was characterized as a "hang up"—at an address associated with the phone number around 1:35 am. The current occupants of the house located at the address associated with the phone number told Hales that the police were mistaken because no one there dialed 911. At 2 a.m., Corporal Joseph Johns responded to a 911 call. Hales arrived at A.W.'s home about five minutes

later. Johns stated that when he arrived, A.W. was seated in the locked truck and did not want to get out. Once A.W. exited the truck, Hales described her demeanor as sluggish, dazed, and as though she had been crying. He also noted that she was bent over, walking slowly, and kept her arms around her stomach. Johns spoke with A.W. briefly and noted that she appeared nervous, scared, and did not want to talk about what had happened. She told Johns that an unknown black male broke into her house, forced her into the bedroom with a knife, told her not to look at him, and raped her. She described him as 6-foot tall, wearing black sweatpants and a zip-up hooded sweatshirt.

While Johns completed the interview with A.W., Hales went into the house to make sure the suspect was not there. He described the door and doorjamb as heavily damaged. Although the door itself was old, Hales stated that the damage to the dead bolt lock appeared recent and that the lock looked completely splintered and destroyed. Hales also saw a small piece of wood lying in the middle of the living room about 8 or 9 feet from the door. After speaking with A.W., Johns also investigated inside the house and collected a pair of women's underwear, a pillowcase, a comforter, and bed sheets as evidence.

Meanwhile, A.W. was driven by ambulance to the hospital where she met with Sexual Assault Nurse Examiner (SANE) Debra Higgins. The SANE nurse examined A.W. and described A.W. as upset, crying, and anxious. The purpose of the SANE exam was to obtain A.W.'s medical history, identify any injuries from the alleged assault, and collect evidence. A.W. told Higgins what happened and stated that the man who assaulted her did so by penetrating her with his finger and penis. She also told Higgins that she had not had any consensual sex within the last 72 hours and that she was pregnant. Higgins noted a small bruise on A.W.'s left thigh, an abrasion on the outside of her genital area, and noted that her genitals appeared very red, swollen, and tender; she described A.W.'s injuries as resulting from a blunt object. Higgins could not conduct an exam with her speculum—a medical tool used to inspect a woman's vaginal canal—because A.W.

started to cry and complain of pain. However, Higgins was able to use a vaginal swab to collect evidence from inside A.W.'s vagina.

A.W. spoke with Hales at the hospital. He described her demeanor as shocked and dazed. She told Hales that because the man had covered his face with his hooded sweatshirt, she did not recognize him. A.W. also stated to Hales that as she was going to bed around 1:30 a.m. she heard loud banging at the front door. She went to the living room to see what was happening and saw the door moving violently. She became scared and called 911 from her bedroom. When she looked up, she saw a dark-skinned black male in her bedroom, and he had what looked like a kitchen knife in his hand. Hales collected the completed SANE kit and took A.W.'s pants and underwear for further testing.

A.W. spent the night at her father's house then went back to the house later in the day to move out. While at the house, A.W. talked with two of her neighbors about what happened. A.W. told her friend and neighbor, Justina, that the man looked like a guy she had seen at the gas station and that her ex-boyfriend, Brandon Rogers, was friends with the man's cousin, Edward. Justina mentioned that the man A.W. described was nicknamed Dewey. A.W. also spoke with her neighbor Shirley and asked about the guy who lived down the street with Rogers' friend Edward. Shirley told A.W. she was describing Edward's uncle, Dewey.

A.W. called dispatch that afternoon to report that she knew the man who attacked her was nicknamed Dewey and lived on her block. Later that day, A.W. met with Detective Heather Smith and told her that she did not know Dewey personally but that her neighbors had told her his nickname. Smith showed A.W. a photo lineup of six individuals, and A.W. picked out the photo of Jordan, also known as Dewey. A.W. met again with Smith in May 2013. At that meeting, Smith collected A.W.'s DNA. That same month, Smith collected Jordan's DNA. The Kansas Bureau of Investigation (KBI) tested

4

the DNA evidence, the results of which revealed that the seminal fluid only matched two DNA profiles: Jordan and A.W. At trial, the KBI witness stated that seminal fluid tends to lose the DNA profile after 48 to 72 hours.

In July 2013, Jordan was charged with one count of rape under K.S.A. 2012 Supp. 21-5503(a)(1)(A), one count of aggravated burglary under K.S.A. 2012 Supp. 21-5807(b), and one count of misdemeanor criminal damage to property under K.S.A. 2012 Supp. 21-5813(a)(2) and (b)(3).

At trial, Jordan testified that on February 6, 2013, he was having trouble sleeping, so he went outside to smoke a cigarette and saw A.W. smoking a cigarette on her porch. He testified that he went over to her house to see if Rogers wanted to get high and because he had talked to A.W. at the gas station a couple of times before. Once he got to her house, Jordan stated that he asked A.W. if she wanted to get high. He said she agreed. He further testified that Rogers and Edward told him A.W. smoked methamphetamine. While Jordan admitted that he had never personally seen A.W. use methamphetamine prior to February 6, 2013, he stated that Rogers, Edward, and other people had told him that A.W. was a "dope whore." Jordan admitted that he did not think that A.W. and Edward ever had a relationship.

Jordan testified that once he was inside her bedroom he asked her again if she wanted to get high and told her that he would give her a gram of methamphetamine, which he stated had a $50 street value, and $20 cash. Jordan stated that A.W. agreed; they smoked together and then had consensual sex. After they finished, Jordan stood up, refused to pay A.W. any money, and left. He stated that he had lied to her about having any money. After leaving, Jordan realized that he left his wallet on the floor in her house. He had taken his wallet out because it had money and drugs. When Jordan returned to A.W.'s house, the front door was shut so he had to push his way in with both hands to open it and heard something crumple. Jordan stated that A.W. was there and that she

5

asked him if he was going to tell Rogers. To keep her from talking, Jordan stated that he would tell Rogers.

Jordan also called Rogers as a witness at the trial. Rogers testified that Jordan and Edward were like family to him. Rogers testified that on February 6, 2013, he was living with A.W. and that they had started dating in November 2012. Rogers testified that at the time of the incident, A.W. was one month pregnant and that he believed that he was the father of her baby. A paternity test later revealed he was not the father. Rogers testified that his relationship with A.W. ended in November 2013.

Rogers also testified that he had used methamphetamine and had used the drug with Edward and Jordan before. He also testified that he used methamphetamine in A.W.'s house. Rogers also stated that A.W.'s front door was damaged before February 6, 2013, and that it was damaged when he began to live there in January 2013. He stated that the dead bolt lock wiggled, the frame and door were cracked and broken, the door knob did not work, and the door was easily pushed open and closed.

Finally, Rogers testified that he had consensual sex with A.W. the night before February 6, 2013. He stated that he had a penis ring and engaged in rough sexual intercourse with A.W. that lasted about two hours. He stated that on February 6, 2013, he was at another woman's house. The State later called the woman on rebuttal, who testified that Rogers was not at her house on February 6, 2013. She stated that the last time she had seen Rogers was in January 2013.

The jury convicted Jordan on all counts. The district court sentenced Jordan to 620 months in prison for rape, 32 months in prison for aggravated burglary, and 6 months in jail for criminal damage to property, with the aggravated burglary and criminal damage to property sentences to run concurrent with the rape sentence.

6

Jordan timely appeals.

## DID THE DISTRICT COURT DENY JORDAN
## HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL?

Jordan argues that the district court violated his constitutional right to a fair trial by excluding relevant evidence integral to his theory of defense.

When reviewing evidentiary challenges and a defendant's assertion that the district court violated his or her constitutional right to present his or her theory of defense, our Supreme Court has stated:

"Appellate courts apply a multistep analysis of decisions to admit or exclude evidence. Under this multistep analysis, the first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. Review of whether a trial court erroneously excluded evidence that is integral to the defendant's theory of his or her defense is de novo.

"Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case. Probative evidence requires only a logical connection between the asserted fact and the inference it is intended to establish.

. . . .

"A criminal defendant has the right, under both the Kansas and United States Constitutions, to present the theory of his or her defense, and the exclusion of evidence that is an integral part of that theory violates the defendant's fundamental right to a fair trial. In order to constitute error, the excluded evidence supporting the defense theory must be relevant, admissible, and noncumulative. A defendant's right to present evidence in support of a defense is subject to certain restraints:  the evidence must be relevant, and

7

evidentiary rules governing admission and exclusion of evidence are applied. [Citations omitted.]" *State v. Robinson*, 306 Kan. 431, 435-36, 394 P.3d 868 (2017).

To consider what was integral to Jordan's defense, we start with what the State had to prove to convict him. Having charged Jordan with one count of rape, the State had to prove that Jordan engaged in nonconsensual sexual intercourse with A.W. who was overcome by force or fear. See K.S.A. 2012 Supp. 21-5503(a)(1)(A). The State also charged Jordan with aggravated burglary, which required the State to prove that Jordan knowingly entered A.W.'s residence without permission and with the intent to commit a felony inside when one or more persons was present. See K.S.A. 2012 Supp. 21-5807(b). As to the third count, misdemeanor criminal damage of property, the State had to prove that Jordan unlawfully and knowingly damaged the front door, door jam, and lock of the property and caused less than $1,000 in damage. K.S.A. 2012 Supp. 21-5813(a)(2) and (b)(3).

The essence of Jordan's defense to the rape charge was consent. Jordan's position was that he went to A.W.'s home, and she agreed to exchange consensual sex for drugs and money. After he had consensual sex with A.W., A.W. developed a motive to lie because Jordan went back on his promise to give her money. Jordan argues on appeal that the district court's exclusion of evidence showing A.W.'s prior drug use prevented him from establishing an integral part of his theory of defense: that A.W. had a motive to consent to sexual intercourse in exchange for drugs.

The evidentiary challenge on appeal stems from two rulings by the district court at trial. The first ruling occurred when Jordan's counsel was cross-examining A.W. Counsel asked and A.W. denied that Jordan came over to her house to use methamphetamine with her. Then counsel asked if A.W. used methamphetamine in the month of February 2013, and A.W. stated that she had not because she was pregnant. Next, counsel asked if A.W. had used methamphetamine in the past, and the State objected. In chambers, defense

8

counsel argued that the question went to A.W.'s admission at the preliminary hearing to using methamphetamine before and to Jordan's theory of defense that Jordan went to A.W.'s house to use methamphetamine with her. After hearing arguments, the district court excluded the evidence as criminal misconduct and irrelevant. The district court then prohibited Jordan's counsel from inquiring further into A.W.'s prior drug use.

Later at trial, Jordan's counsel was questioning Rogers on his and A.W.'s prior methamphetamine use. The State objected, and the district court ruled the question was improper based on the previous ruling because it inquired into A.W.'s prior drug use. Jordan's counsel proffered that she intended to show that Rogers saw A.W. use methamphetamine in his presence "around this date" as corroborating evidence to Jordan's theory of defense and Jordan's future testimony that he saw A.W. use methamphetamine on February 6, 2013. The district court ruled that Jordan could testify based on his theory of defense but excluded the proffered testimony from Rogers.

Other than the limited questions allowed on cross-examination of A.W., the district court's evidentiary rulings prohibited Jordan from exploring other evidence of A.W.'s prior drug use except as asserted by Jordan himself in his own testimony. In particular, Jordan challenges the district court's exclusion of Rogers' proffered testimony that he saw A.W. using methamphetamine "around this date."

There is very little caselaw on this issue. In support of his argument, Jordan argues we should adopt the Vermont Supreme Court's reasoning in *State v. Memoli*, 189 Vt. 237, 18 A.3d 567 (2011), where the substance of the evidentiary ruling in that case relates to Jordan's appeal. In relevant part, Memoli and a female companion offered the complaining witness a ride home in the early morning hours of New Year's Day. The complainant admitted she had smoked marijuana and drank "a lot" of alcohol that night and agreed to go to Memoli's apartment and into his bedroom. Memoli's and the complainant's version of events differ in that the complainant stated that Memoli forced

her to perform sexual acts on him and to smoke crack cocaine, while Memoli and his female companion asserted the complainant had not been forced into either act.

Before trial, the district court held a hearing on a motion in limine where the State sought to exclude certain evidence of the victim's prior drug use. Memoli proffered to the district court that he intended to offer relevant evidence of the victim's prior drug use to support his theory of defense, specifically a video showing the victim buying drugs and presenting witnesses who saw her use and buy drugs within 30 days before and after the incident. Defense counsel argued:

> "'[These two issues] go to the heart of our defense. If we're not allowed to deal with [these issues], we don't have a defense. Our defense is very simple. Our defense is that the complaining witness traded sex for drugs. It's as simple as that, and it's a common occurrence among a certain group of individuals who are addicted to crack cocaine. It's just a fact of life, and so we have a voluntary defense. Our defense is that she voluntarily consented, and the reason that she did was . . . that she was a crack addict, and my client was in a position to give her all the crack that she wanted.'" 189 Vt. at 242.

Following the hearing, the district court issued a broad ruling denying defense counsel's proffer and limiting the evidence of the complainant's drug use only to the night in question. The district court also found the proffered evidence not relevant to the issue of consent. Memoli was convicted.

On appeal, the Vermont Supreme Court reversed Memoli's conviction and held that evidence of the complainant's prior drug use was relevant to support the defendant's theory of consent:

> "The [trial] court's decision was erroneous because complainant's drug use within thirty days before and after the charged incident was relevant to the defense that she consented to sexual acts with defendant to obtain crack cocaine. In sexual assault cases

10

where the case hinges on the credibility of the complainant, 'the presence of an ulterior motive for the victim's making the accusations is often a critical issue.' Thus, proffered evidence relating to a defense theory of consent is relevant. [Citations omitted.]" 189 Vt. at 248.

The State counters with two cases having similar facts but which reach the contrary result. First, the State cites to *Commonwealth v. Bell*, 400 S.W.3d 278 (Ky. 2013), where the defendant had been charged with rape and sodomy, among other things, and the defendant's theory of defense was that the victim had traded sexual favors for drugs, thus making the sex acts consensual. On appeal, the defendant argued that his constitutional right to present a defense was denied because the trial court excluded such evidence. The Kentucky Supreme Court affirmed, holding that the district court did not completely prevent the defendant from introducing evidence of the victim's drug use but merely limited it and did not abuse its discretion when doing so. 400 S.W.3d at 282-84.

Second, the State cites to another Vermont case, *State v. Faham*, 190 Vt. 524, 21 A.3d 701 (2011), where, again, the defendant was charged and convicted of a sex crime, this time attempted sexual assault. The core of the defendant's defense was that the complained of sex acts were consensual because the victim traded sex for drugs. The Vermont Supreme Court, unlike in *Memoli*, affirmed the district court's exclusion of evidence of the victim's drug use. 190 Vt. at 530.

We find *Memoli* persuasive and the cases cited by the State to be distinguishable. *Bell* is distinguishable because the Kentucky Supreme Court relied principally on a cumulative evidence argument to uphold the district court. While it is true that the *Bell* trial court, like in the present case, allowed the defendant to testify as to the victim's drug use, unlike in our case, the trial court also allowed evidence of the victim's positive drug test on the date of the incident. Moreover, the Kentucky Supreme Court held that the defendant's additional desire to introduce evidence of the victim's 20-year history of drug

11

use and addiction constituted "'piling on.'" 400 S.W.3d at 283. *Faham* also is easily distinguishable because the defendant in that case never proffered before the trial court his theory that the victim's drug use was relevant to his defense that the sex act in question was consensual. 190 Vt. at 528.

Similar to the present case, Memoli's theory of defense was that his sexual intercourse with the victim was consensual, and he sought to prove consent by showing (1) the defendant and the victim agreed to exchange consensual sex for drugs or money; (2) after forming the agreement, the couple engaged in consensual sex; and (3) after sex the victim developed a motive to lie because the defendant reneged on his promise of drugs or money. Also similar is that the district court excluded evidence supporting that theory, such as evidence establishing the victim's prior drug use. *Memoli* differs in one respect from our case because the trial court in *Memoli* barred all evidence of the victim's prior drug use, unlike here where the district court allowed Jordan to testify to his knowledge of A.W.'s prior drug use.

A.      *Evidence of A.W.'s Prior Drug Use is Relevant to Jordan's Theory of Consent.*

We agree with Jordan's argument that the district court's exclusion of evidence was erroneous because A.W.'s prior drug use was relevant to Jordan's defense that A.W. consented to sexual intercourse in exchange for drugs and money. Relevant evidence has "any tendency in reason to prove any material fact." K.S.A. 60-401(b); *State v. Huddleston*, 298 Kan. 941, 959, 318 P.3d 140 (2014). Relevant evidence must be both probative and material. *Robinson*, 306 Kan. at 435.

To be probative, the evidence must have "a logical connection between the asserted fact and the inference it is intended to establish." 306 Kan. at 436. Also, probative evidence tends to furnish, establish, or contribute towards proof. *State v. Rosa*, 304 Kan. 429, 436, 371 P.3d 915 (2016). Here, the evidence concerning A.W.'s drug use

contributes towards proving two critical inferences: (1) Jordan did not enter A.W.'s house uninvited but went there to use drugs with A.W., and (2) A.W. consented to sexual intercourse with Jordan.

The State argues that the evidence is not probative because the evidence only proves Rogers' and A.W.'s relationship and does not demonstrate that A.W. would consent to sexual intercourse with Jordan. Admittedly, the evidence has a weaker connection toward showing consent. The evidence carries more weight in showing A.W. used drugs on the night in question. But the prior drug-use evidence furnishes proof that A.W. would agree to use methamphetamine with Jordan on that night, which establishes a logical connection to the inference that A.W. would also agree to sexual intercourse with Jordan in exchange for the drugs. See *State v. King*, 293 Kan. 1057, 1064-65, 274 P.3d 599 (2012) ("'Evidence of bias, interest, or improper motives of a witness is always relevant in order to place the witness' testimony in proper prospective.'"); *State v. Carapezza*, 286 Kan. 992, 998-1000, 191 P.3d 256 (2008) (evidence of drug use or addiction relevant to establish motive). Accordingly, we find evidence of A.W.'s drug usage, particularly Rogers' proffered testimony that A.W. used drugs around the time of the incident, probative because it tends to establish a logical connection towards proving A.W. would agree to Jordan's offer to exchange consensual sex for methamphetamine.

Evidence of A.W.'s prior drug use is also material. "Material evidence tends to establish a fact that is at issue and is significant under the substantive law of the case." *Robinson*, 306 Kan. at 436. The evidence of A.W.'s prior drug use supports Jordan's defense that he did not break into A.W.'s home with the intent to commit a felony, undermining the State's ability to prove the elements of aggravated burglary and criminal damage to property. More significantly, as we have already explained, the evidence contributes towards the proof that A.W. may have used drugs on that night and affects the substantive law of the case because such evidence assists in proving Jordan's consent

13

theory—that he and A.W. had consensual sex in exchange for drugs—which undermines the State's rape case. Thus, the evidence is material to Jordan's theory of defense.

Our dissenting colleague confidently declares: "It is simply not a reasonable inference to conclude that because a woman uses drugs, she will naturally be motivated to trade sex for drugs. In other words, a woman's use of drugs is not probative that she will consent to sex in exchange for drugs." Slip op at 24. We must take the world as it is, not as how we would like it to be, and we think it beyond dispute that a drug user—male or female—*could* exchange sex for drugs. In fact, it is so well established that drug use or addiction can be a motivating factor in the commission of a crime that many courts in our state have established drug courts to combat it. See Supreme Court Rule 109A (2017 Kan. S. Ct. R. 177) (allowing for creation of drug courts). If drug use or addiction is a motivator for crime, it is no stretch to conclude that a drug user's or addict's craving for an intoxicant could be the motivator for other bad acts, such as exchanging sex for drugs. Given that fact, we agree with the Vermont Supreme Court that "[i]n sexual assault cases where the case hinges on the credibility of the complainant, 'the presence of an ulterior motive for the victim's making the accusations is often a critical issue.'" *Memoli*, 189 Vt. at 248. Accordingly, we find that the district court erred in ruling that evidence of A.W.'s prior drug use was irrelevant.

B.   *The Excluded Evidence is Not Inadmissible Under K.S.A. 60-447 and K.S.A. 2016 Supp. 60-455.*

The relevance of A.W.'s prior drug use notwithstanding, the State also argues that such evidence is inadmissible under K.S.A. 60-447 and K.S.A. 2016 Supp. 60-455(a). K.S.A. 60-447 prohibits evidence of specific instances of conduct to prove that a particular character trait is bad, while K.S.A. 2016 Supp. 60-455(a) prohibits the introduction of evidence that a person committed a crime or civil wrong on a specified occasion. The district court ruled the evidence of A.W.'s prior drug use was inadmissible

14

in part because it showed criminal misconduct. Because our determination of whether evidence of A.W.'s prior drug use was inadmissible requires an interpretation of these two statutes, our review of the question is unlimited. See *State v. Bowen*, 299 Kan. 339, 352, 323 P.3d 853 (2014).

We are unpersuaded by the State's argument that A.W.'s prior drug use constituted impermissible character evidence barred by K.S.A. 60-447. In *Memoli*, the prosecution argued such evidence was inadmissible because the defendant sought to introduce evidence of the complainant's prior drug conduct to prove that she was a drug addict. The Vermont Supreme Court rejected this argument and instead held that the defendant's proffer had a narrower purpose—"that evidence of complainant's drug use was relevant to demonstrate she had a motive to consent to sexual acts with defendant"—and found this purpose consistent with Vermont's version of K.S.A. 2016 Supp. 60-455. 189 Vt. at 250.

Similarly, K.S.A. 60-447 is inapplicable here because Jordan did not assert A.W.'s prior drug use for the purpose to show a character trait that A.W. was a drug addict. Rather, Jordan sought to admit this evidence to show that A.W. had a motive to consent to the sexual intercourse with Jordan in exchange for drugs. See *State v. Webber*, 260 Kan. 263, 277, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997). Therefore, K.S.A. 2016 Supp. 60-455 applies.

K.S.A. 2016 Supp. 60-455 states in relevant part:

"(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

"(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive,

15

opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Based on the language contained in K.S.A. 2016 Supp. 60-455(a), at first blush it would appear that evidence of A.W.'s prior drug use would be inadmissible because it provides proof that she committed a crime—using methamphetamine. But K.S.A. 2016 Supp. 60-455(a) is subject to the eight exceptions in K.S.A. 2016 Supp. 60-455(b), one of which is motive. Evidence of A.W.'s prior drug use went to showing A.W.'s motive to consent to sexual intercourse with Jordan in exchange for drugs.

The district court erred in holding the evidence of A.W.'s prior drug use was inadmissible as criminal misconduct because such evidence is admissible under K.S.A. 2016 Supp. 60-455(b).

C.   *The Excluded Evidence is Noncumulative.*

Finally, although the State does not specifically argue that Jordan's effort to introduce Rogers' proffered testimony that A.W. used drugs around the time of the incident was cumulative, it does suggest that Jordan was not completely barred from presenting his own testimony as to A.W.'s prior drug use, thereby justifying the district court's decision to exclude other evidence of A.W.'s drug use. However, we reject any argument that Rogers' proffered testimony concerning A.W.'s drug use was in any way cumulative because Jordan had no other way to present evidence, other than his own testimony, that A.W. had used drugs around the date in question.

A.W. denied using drugs in February 2013. Jordan testified that A.W. used drugs on February 6, 2013. The district court also permitted Jordan to testify that he knew of A.W.'s drug use and reputation as a "dope whore" because of Rogers and Edward. But the district court prohibited defense counsel from questioning Rogers and, inferentially, other

16

witnesses on A.W.'s prior drug use. Rogers' testimony as proffered was noncumulative because only he could testify that he saw A.W. use drugs near that date. As stated above, A.W. denied using drugs during February 2013, and Jordan admitted that he did not personally see A.W. use drugs before February 6, 2013. Therefore, the excluded evidence—that Rogers saw A.W. use methamphetamine around February 6, 2013—was noncumulative and relevant.

Evidence of A.W.'s prior drug use was both relevant and admissible, and the district court erred in excluding such evidence.

D.      *The District Court's Error to Exclude Evidence is Not Harmless.*

Once we find error on the part of the district court, we must then determine whether the error was harmless. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013). Under this standard, the State, as the party benefitting from the error, has the burden to establish "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).

The State argues we should find the error harmless because the district court afforded Jordan the full opportunity to present his theory of defense to the extent that a jury could reach a conclusion on its validity. In considering the State's claim, we agree that the district court did permit Jordan to present some evidence at trial supporting his theory of defense—including his knowledge of A.W.'s prior drug use. Jordan testified that he asked A.W. if she wanted to get high and she agreed; then when they went inside, he made another offer to exchange consensual sex for drugs. However, Jordan admitted that he had not personally seen A.W. use methamphetamine in the past and had not used methamphetamine with A.W. until February 6, 2013. Jordan also testified that his

17

knowledge of A.W.'s prior methamphetamine use only came second-hand—he learned from Rogers and Edward, among others, that A.W. used the drug and had a reputation as a "dope whore." In the face of A.W.'s own testimony that she was not using drugs around the time of the incident because she was pregnant, such evidence is hardly compelling. It certainly did not convince the jury.

Jordan also has a constitutional right to present his theory of defense that A.W. consented to the alleged sex acts. Here, the excluded evidence that A.W. may have used methamphetamine close to the date of the incident provides proof that she could have accepted Jordan's offer to exchange consensual sex for drugs. It also rebuts A.W.'s denial that she used the drug. Such evidence coming from a third party—Rogers, who was also A.W.'s boyfriend—is much more compelling, despite his weaknesses as a witness.

We acknowledge the State's other evidence in support of its case and the dissent's strong argument as to why any error in excluding A.W.'s drug use was harmless. But the State's burden is to show *beyond a reasonable doubt* that the exclusion of such relevant evidence was harmless, and we have a reasonable doubt. For example, Jordan did not dispute that the DNA revealed that the seminal fluid collected from A.W. only matched two people: A.W. and Jordan. But such evidence says nothing about whether the sex acts were consensual. There is also the evidence of A.W.'s two 911 calls on February 6, 2013, between 1:30 a.m. and 2 a.m. A.W. called 911 and hung up. Then, about 30 minutes later, A.W. called 911 again and reported the incident. But again, an argument could be made that A.W.'s termination of the first 911 call supports Jordan's theory of defense that the encounter was voluntary because Jordan could posit that A.W. cancelled the 911 call once she learned the person outside was Jordan.

On balance, while it is a close call, we conclude the State has failed to prove the district court's erroneous exclusion of evidence was harmless beyond a reasonable doubt. Jordan's theory of defense that he and A.W. traded sexual favors for drugs and money

18

undermines the State's consent element of the rape charge, undermines the intent to commit a felony element in the aggravated burglary charge, and lends credibility to Jordan's defense to the criminal damage to property charge.

The excluded evidence is an integral part of establishing Jordan's theory of defense to consent. It suggests first that A.W. would use drugs in that timeframe and second that she would have had a motive to exchange consensual sex for the drugs. The evidence is not necessarily strong, but it is integral to providing Jordan with the full opportunity to present his defense that the sexual intercourse was consensual.

The evidence also came down to a witness credibility determination between Jordan and A.W. on many issues—including consent. In excluding evidence that Rogers saw A.W. use methamphetamine around February 2013, the district court also prohibited the defense from questioning other witnesses on A.W.'s drug use near that time period. District courts have "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). However, those limits cannot prevent all inquiry into an issue that is critically relevant to the defendant's theory of defense. See *State v. Atkinson*, 276 Kan. 920, 929, 80 P.3d 1143 (2003).

The exclusion prevented Jordan from cross-examining A.W. on prior drug use and rebutting A.W.'s contentions that she denied using drugs in February 2013. Only Jordan and A.W. could testify to A.W.'s consent and drug use on the night in question, but the district court prevented inquiry on an issue critically relevant to the theory of defense: whether A.W. had previously used drugs around February 2013. This inquiry was critical because it could establish that A.W. had a motive to consent to sex in exchange for drugs. Likewise, the evidence of A.W.'s prior drug use was an integral part of establishing Jordan's defense that she had some motive to accept his offer to engage in consensual sex

19

in exchange for drugs and money. The district court denied Jordan his constitutional right to a fair trial by excluding this evidence.

We therefore reverse Jordan's convictions, vacate his sentences, and remand for a new trial.

* * *

ARNOLD-BURGER, C.J., dissenting: I respectfully dissent. Although I believe it was error to not allow Steven Jordan to inquire of Brandon Rogers regarding A.W.'s drug use at or close to the time of the rape, it was not a constitutional error and even if it was, it was harmless. I would affirm Jordan's convictions.

The facts are set out in the majority opinion. I will only repeat them here as necessary to the analysis.

Jordan argues on appeal that he is entitled to a new trial because the trial court erred by refusing to allow him to inquire into the victim's prior drug use. The issue is whether the court's ruling constituted the exclusion of relevant evidence which unconstitutionally limited Jordan's right to present his chosen theory of defense. If the court's decision to exclude evidence of A.W.'s drug use was proper, we need go no further. The right to present a defense is subject to the rules of evidence. *State v. Love*, 305 Kan. 716, 723, 387 P.3d 820 (2017). It is not error for the trial court to exclude evidence that is not relevant to a legally sufficient theory of defense. *State v. Roeder*, 300 Kan. 901, 914, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). If the exclusion was improper, then we need to examine whether it irretrievably impacted Jordan's constitutional right to present his theory of defense. I begin with some overarching rules regarding the admissibility of evidence.

20

Generally speaking, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). This definition encompasses two elements: a materiality element and a probative element.

Evidence is material when the fact it supports is in dispute in the case. *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). The appellate standard of review for materiality is de novo. *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015). Evidence is probative if it has any tendency to prove any material fact. *State v. Dupree*, 304 Kan. 43, 63, 371 P.3d 862 (2016). An appellate court reviews the district court's assessment of the probative value of evidence under an abuse of discretion standard. *Page*, 303 Kan. at 550-51. The trial court violates a criminal defendant's fundamental right to a fair trial if the court excludes relevant, admissible, and noncumulative evidence which is an integral part of the theory of the defense. In cases where a criminal defendant asserts that the district court has unconstitutionally limited the right to present the chosen theory of defense, the appellate court reviews the issue de novo. *State v. Seacat*, 303 Kan. 622, 638, 366 P.3d 208 (2016).

As the majority concedes, the only material fact in this case was consent. Slip op. at 8. There is no dispute that Jordan and A.W. had sex; the issue is whether it was consensual. A.W. contends it was not. She contends Jordan forced his way into her home, causing her to drop the phone as she was calling 911 for assistance, and forced her to lie upon the bed, all while holding a knife to her and covering his face. Jordan claims the entire incident was consensual. He claims that A.W. invited him into the house, they walked in together, each had one "hit" of methamphetamine, and then they had consensual sex. All of this was part of his scheme to trick A.W. into having sex for drugs and money—two things he had no intention of ever giving her. In his own words, he was "just . . . trying to get something for nothing." When A.W. realized Jordan may tell

21

Rogers about their encounter, the defense argued, she called the police to report it as a rape.

Jordan complains that he was erroneously prevented from presenting evidence through A.W. that she had previously used methamphetamine. In addition, he was prevented from presenting evidence through her ex-boyfriend, Brandon Rogers, that A.W. had used methamphetamine in his presence in the past and that he witnessed her use "methamphetamine on February 6, 2013"—the date of the offense.

*Evidence of A.W.'s general prior drug use was not relevant.*

First, it is unclear from the majority opinion whether it is approving the relevance of evidence of A.W.'s prior drug use in general, or only her drug use on or about the time of the offense. To the extent the majority is finding that any evidence of A.W.'s prior drug use is relevant, I disagree.

The only evidence proffered regarding A.W.'s testimony was that she testified at the preliminary hearing regarding her prior use and the defense wanted to question her about it. But upon review of the preliminary hearing transcript, it is clear that she testified that she had not used methamphetamine for approximately three years from the date of the hearing, or roughly December 2010. The question of whether evidence concerns material too remote in time to be admissible lies within the discretion of the trial court. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 73, 274 P.3d 609 (2012); see also *State v. Baker*, 281 Kan. 997, 1009, 135 P.3d 1098 (2006) (guard's testimony regarding victim's state of mind three years before his death is too remote or tenuous to establish victim's state of mind—and likelihood that he committed suicide—at the time of his death). I simply cannot conclude that the district judge abused his discretion in finding that A.W.'s drug use three years prior to this incident was not

probative as to whether A.W. consented to sex in exchange for drugs on February 6, 2013. Accordingly, it was properly excluded.

*Evidence of A.W.'s use of drugs on or about the date in question was relevant to rebut her testimony that she did not use drugs during that time, but not to show that she had a motive to consent to sex in exchange for drugs.*

To reiterate, the only material fact in dispute in this case was consent. Jordan did not present or proffer any testimony that A.W. had exchanged sex for drugs in the past. He testified that he had been told by others that A.W. used methamphetamine, was "easy," and was a "dope whore." He testified that before that night he had never witnessed A.W. using drugs. A.W. testified that she did not use methamphetamine at the time because she was pregnant. And there was no dispute that she was pregnant at the time of the rape.

During Brandon Rogers' testimony, after he testified that he had used methamphetamine in A.W.'s home, the defense proffered the following out of the presence of the jury:

> "Mr. Jordan will be testifying that he, in fact, saw [A.W.] use methamphetamine on February 6, 2013. It's the heart of our defense, Judge. She's denied that she used it. We're entitled to present our defense."

The judge indicated that this would be proper rebuttal evidence. The judge also indicated that defense counsel could ask Rogers if he had used methamphetamine in A.W.'s presence. The defense then changed tactics a bit.

> "[Defense counsel]:  So just for clarification, may I ask Mr. Rogers as he would also testify that its collective evidence?
> "THE COURT:  No.

23

"[Prosecutor]: Testify about what?

"[Defense counsel]: That he has seen her use methamphetamine in his presence around this date.

"THE COURT: No.

"[Defense Counsel]: Okay."

Defense counsel repeated his prior question to Rogers as follows: "Brandon, in the house that you shared with [A.W.], did you yourself—I mean, only you use methamphetamine?" Rogers responded in the affirmative. The defense apparently abandoned its proffer, which had been allowed as proper rebuttal testimony, that Rogers had seen A.W. use methamphetamine on the date of the rape because Rogers later testified that he was with someone else, another girlfriend, on February 6. Rogers never testified that he was with A.W. at any time on February 6. In fact, Jordan himself testified that Rogers was only at A.W.'s house "every blue moon . . . every once in awhile." A.W. agreed, indicating that Rogers was "hardly ever" at her house and she did not see him very often. He was not her boyfriend at the time of the rape.

I agree with the majority that evidence carefully limited to testimony that someone saw the victim using drugs at or close to the time of the rape would be admissible. But given the testimony in this case, it is only admissible to rebut A.W.'s testimony that she did not use drugs during that same time frame because she was pregnant; thus impacting her credibility. I do not believe, as the majority suggests, that evidence of A.W.'s prior drug use was admissible to show A.W.'s motive to consent to sexual intercourse with Jordan in exchange for drugs. See slip op. at 15, 17.

It is simply not a reasonable inference to conclude that because a woman uses drugs, she will naturally be motivated to trade sex for drugs. In other words, a woman's use of drugs is not probative that she will consent to sex in exchange for drugs. I am relatively certain that there are many men and women in this world who are addicted to drugs but do not routinely exchange sex for drugs. Because A.W.'s use of drugs is not

24

probative of consensual sex, it could not serve as an integral part of Jordan's theory of defense. If the mere use of drugs is probative of consent, then anytime a woman uses drugs, a defendant charged with rape could claim that she had the motive to exchange sex for drugs, and admit evidence of her drug use—a very bold and prejudicial claim when, as here, there is absolutely no evidence to support it. For the same reasons we do not routinely allow the defense to seek out evidence of a victim's prior sexual promiscuity, evidence that she has used drugs in the past does not establish a motive of trading sex for drugs. See K.S.A. 2016 Supp. 21-5502. Just as "a victim's lack of chastity has no bearing whatsoever on her truthfulness and generally has no bearing on the important issue of consent" neither, I believe, does the victim's prior drug use. *In re Nichols*, 2 Kan. App. 2d 431, 434, 580 P.2d 1370 (1978) (cited with approval in *State v. Atkinson*, 276 Kan. 920, 926, 80 P.3d 1143 [2003]). The majority, in effect, declares as a matter of law that evidence of prior drug use, regardless of how remote in time, is always relevant in a criminal trial because "drug use or addiction is a motivator for crime." Slip op. at 14. I believe that is a bridge too far.

Certainly, the jury could use its common sense to conclude that drugs cost money, and some drug users do not have much money, but it is a quantum leap to conclude that rather than beg, borrow, or steal for the money, women are motivated to exchange sex for drugs. Moreover, in this case, there was no evidence that A.W. did not have money for drugs if she wanted drugs. She testified that she had a job working eight hours a day. And again, there was absolutely no evidence that she had ever exchanged sex for drugs in the past or that she was under the influence of drugs on the date of the rape.

The exclusion of this evidence did not prevent Jordan from presenting a defense or introducing evidence to challenge A.W.'s credibility. Accordingly, I believe his claim of a constitutional error fails.

25

Instead, the failure to allow Rogers to testify about A.W.'s drug use around the time of the rape was admissible solely as rebuttal evidence to establish A.W. was lying when she said she was not using drugs while she was pregnant. The use and extent of rebuttal evidence rests in the sound discretion of the trial court, and the ruling of the trial court will not be grounds for reversal unless it appears that discretion has been abused to prejudice the defendant. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 5, 303 P.3d 680 (2013).

Although I agree that Rogers' rebuttal testimony concerning use around the time of the rape should have been allowed, I have no trouble finding its exclusion was not prejudicial. Defense counsel's entire approach in this case was to discredit the victim's account of the events of the evening. Counsel vigorously cross-examined the victim and other witnesses for the prosecution. Counsel pointed out numerous inconsistencies between a witness' testimony at trial as compared to at the preliminary hearing. Inconsistencies were also highlighted between written statements and trial testimony, including allegations of shoddy police work. Rogers, A.W.'s ex-boyfriend, was allowed to testify twice during the trial that he did not believe A.W.'s story of the events that night. In addition, he testified that he was not upset with Jordan about what happened because he did not believe Jordan did it. He testified that Jordan was like family to him. Rogers was allowed to testify that he had used methamphetamine in A.W.'s residence and in A.W.'s presence, although counsel never asked the later. And finally, Rogers' testimony that he was with another woman on February 6 was discredited when she took the stand to testify that she had not seen him since January 2013, several weeks before the rape. In sum, there was plenty of evidence impugning A.W.'s credibility as well as that of other prosecution witnesses. The exclusion of one more piece of evidence in that regard, particularly from a witness whose own motives and credibility were in serious doubt, I can easily conclude was not prejudicial to Jordan.

Accordingly, because the court's decision to exclude evidence of A.W.'s drug use did not constitute error, we need go no further to examine whether it irretrievably

impacted Jordan's constitutional right to present his theory of defense. On that basis, I would affirm Jordan's convictions.

*But even if the district court erred in excluding evidence of A.W.'s drug use and it implicated Jordan's constitutional right to present a defense, the error was harmless.*

The erroneous exclusion of evidence is subject to review for harmless error under K.S.A. 2016 Supp. 60-261. If the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard: whether the party benefiting from the error proves beyond a reasonable doubt that the error would not or did not affect the outcome of the trial in light of the entire record. *State v. Santos-Vega*, 299 Kan. 11, 23-24, 321 P.3d 1 (2014). When a district judge allows a criminal defendant to present evidence supporting his or her theory of defense such that the jury could reach a conclusion on its validity, exclusion of other evidence is not necessarily error. *State v. Jones*, 287 Kan. 547, 555, 198 P.3d 756 (2008).

Factors an appellate court can consider in reviewing the erroneous exclusion of evidence for harmless error include: "'the importance of the witness' testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the case.'" *State v. Burnett*, 300 Kan. 419, 434-35, 329 P.3d 1169 (2014).

Only two proffers were made in this case for the admission of evidence that was ultimately excluded, A.W.'s preliminary hearing admission that she last used drugs three years earlier and Rogers' testimony concerning A.W.'s use of drugs on February 6, 2013, or around the time of the rape.

First as to the proffer concerning A.W., her use of drugs three years earlier would not have been beneficial to the defense. Not only was it remote in time, but it supported A.W.'s testimony that she was not using drugs at the time of the rape and would therefore not have agreed to exchange sex for drugs. It would explain why Jordan may have heard negative things about A.W.—a reflection of her past drug use. It would explain why he thought he could take advantage of her and "get something for nothing." But again, as to the only material issue in dispute—consent—there was no testimony offered or proffered that A.W. could not afford to buy drugs if she wanted them nor was there any evidence that she ever exchanged sex for drugs. Accordingly, it is not difficult to conclude, beyond a reasonable doubt, that the exclusion of A.W.'s proffered testimony was harmless.

Next, I turn to the proffer concerning Rogers' testimony. But first it is important to again note that defense counsel's entire approach in this case was to discredit the victim's account of the events of the evening. The jury was certainly put on notice that the defense theory was that A.W. was lying and that she engaged in consensual sex for drugs. The defense chose Rogers, A.W.'s former boyfriend, to make its biggest point—he witnessed A.W. using drugs on February 6, 2013, or around the time of the rape. Counsel described A.W.'s use of drugs *on February 6* as "the heart of our defense." But it is critical to put Rogers' testimony in context.

First, Rogers testified, contrary to the proffer, that he did not see A.W. on February 6, 2013. He testified that he was at another girlfriend's house the night of the incident. Yet when the other woman was called to testify, she stated that she had not seen Rogers that night. In fact, they had ended their relationship a month prior to the rape and she had not seen him since. Rogers testified that he had "rough" and "very hard" sex with A.W. with a pierced penis about 24 hours prior to the rape, apparently in an effort to explain her injuries and complaints of severe pain during the post-rape medical examination. But the DNA results showed only two sources of DNA, A.W. and Jordan. The Kansas Bureau Investigation forensic scientist testified that seminal fluid inserted

28

into a woman would be detectable 48 to 72 hours after it "hits" before seeing "a decline in [the] profile." Jordan himself testified that A.W. did not complain of pain during their sexual encounter 24 hours later.

Rogers testified that A.W. told him that he was the father of her baby. It was only after the baby was born that he discovered otherwise. He was hurt by the news. Rogers testified that Jordan "[was] like family" to him and he did not believe Jordan did it. Rogers was allowed to testify—without objection—that he did not believe A.W.'s story of the events that night. Rogers admitted to the prosecutor that he had numerous convictions regarding crimes of dishonesty and that he had been a daily user of methamphetamine at the time of the incident. A reasonable person could find, beyond a reasonable doubt, that one more allegation from Rogers—who both A.W. and Jordan agreed was rarely around A.W.—regarding A.W.'s drug use would not have affected the trial's outcome.

Moreover, the evidence was overwhelming. There was evidence to support a forced and violent entry into A.W.'s house based on what the officers agreed was new damage to the door and splinters from the door located in the middle of the living room floor. There was no dispute that A.W. made an initial call to 911 that was disconnected before she could speak. After the attack, she ran from the residence and made another 911 call to report the rape. The 911 tapes were admitted into evidence. Witnesses who came into contact with A.W. described her as upset, scared, shocked, nervous, dazed, anxious, crying, and shaking. No one described her as under the influence of drugs. She could not initially identify her attacker because he covered his face and her face. Although she thought there was something familiar about him, it was only later that someone suggested to her it might be Jordan. This is certainly not consistent with Jordan's allegation that A.W. was falsely claiming that he raped her so that Rogers wouldn't find out about their consensual sexual encounter.

29

In addition, the medical exam indicated blunt force trauma to A.W.'s thigh and vaginal area. Her complaints of pain were so severe that the nurse could not insert a speculum. Yet Jordan denied A.W. was in any pain during their encounter. And finally, Jordan said that he did not remember all the details of that evening because he had been smoking methamphetamine that night.

The totality of the circumstances makes it clear that even if the district judge erred in excluding the two pieces of evidence upon which the defense relies, and even if the exclusion implicated Jordan's constitutional right to present a defense, the error was harmless beyond a reasonable doubt.

Because the majority reverses Jordan's convictions, it does not examine the other issues he raises on appeal. I would simply state that after review, I would find that there was no prosecutorial error in closing statements and even if there was, it was harmless. And finally, in general I do not find that there were any errors in sentencing, although I would remand solely on the classification of Jordan's 1985 Colorado juvenile adjudication for attempted burglary because it is unclear under which subsection of the Colorado statute he was adjudicated. Such a determination makes a difference in classifying the conviction as a person or nonperson crime for sentencing purposes.

In conclusion, unlike the majority, I would affirm Jordan's convictions but vacate his sentences and remand for resentencing for a closer examination of Jordan's 1985 Colorado juvenile adjudication for attempted burglary, case no. 85JV355.